Thomas ALGIE, et al., Plaintiffs,

v.

RCA GLOBAL COMMUNICATIONS, INC. and MCI Communications Corporation, Defendants.

No. 89 Civ. 5471 (MJL) (MHD).

United States District Court, S.D. New York.

Nov. 22, 1994.

880

John C. Lankenau, Lankenau, Kovner & Kurtz, New York City, for plaintiffs.

Christine H. Purdue, Hunton & Williams, Fairfax, VA, for defendants.

## MEMORANDUM AND ORDER

DOLINGER, United States Magistrate Judge.

The twenty-three plaintiffs in this case were all long-term employees of defendant RCA Global Communications, Inc. ("RCAG"). They have sued to recover severance benefits allegedly denied them under a plan sponsored by RCAG.

Plaintiffs were each advised that their employment was being terminated one to three days after the stock sale of RCAG to MCI Communications Corporation ("MCIC") on May 16, 1988. They were later paid severance benefits under the MCIC plan rather than under the more generous RCAG plan. In explaining this decision, defendants have claimed that the RCAG plan was terminated as of the closing, and alternatively have asserted that plaintiffs ceased to be RCAG plan participants at that time because they became employees of MCIC's subsidiary MCI International, Inc. ("MCII").

As a result of several pre-trial decisions, plaintiffs were left with one triable claim, under section 502(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), for the denial of benefits. (*See Algie v. RCA Global Communications, Inc.*, 1994 WL 132358 (S.D.N.Y. April 12, 1994)). However, the court also granted plaintiffs partial summary judgment on that claim, holding that they had established beyond triable dispute that the RCAG severance plan had not been terminated by the time that they were fired in late May 1988. (*Id.* at *22–24). Accordingly, the court defined two issues for trial:

1. Did the plaintiffs remain RCAG employees until their post-closing termination?

2. If not, was their departure from RCAG a "layoff" within the meaning of the RCAG severance benefit plan?

(*Id.* at * 32). Thus, at trial the first issue to be determined was whether plaintiffs continued as RCAG employees for the few days between the stock purchase of RCAG by MCIC and their termination or else became employees of defendant MCII in that intervening time.

The court conducted a jury trial on these two questions from July 18 to 26, 1994. At the conclusion of the trial the jury returned a verdict for plaintiffs on the first question, finding that they were still RCAG employees at the time of termination. In view of this finding, the jurors were not required to reach the second question.

In the wake of the trial, defendants have moved for judgment as a matter of law or alternatively for a new trial. Plaintiffs in turn have moved for an award of attorney's fees and expenses and for pre-judgment interest. For the reasons that follow, defendants' motions are denied and plaintiffs' motions are granted.

## I. Defendants' Motions

As noted, defendants seek judgment as a matter of law. This application is based principally on their contention that the trial evidence demonstrates that the RCAG plan was replaced by the MCIC severance plan just prior to the termination of the plaintiffs. Alternatively, defendants seek a new trial

based on their contention that the court erred in three respects in its jury charge. I address these issues in the order presented.

## A. *The Rule 50(a) Motion*

Defendants' motion for judgment rests on two grounds. First, they assert that the RCAG plan was no longer in effect when the plaintiffs were terminated shortly after the closing in which MCIC purchased the stock of RCAG. In support of this contention defendants point principally to evidence that they introduced at trial indicating that in late June 1988 the MCIC Board of Directors had issued a consent that, in substance, authorized the extension of MCIC's severance plan to all employees of RCAG, effective retroactively to the date of the closing. (Tr. 974–77 & Defs.' Exh. 131). Defendants argue that this evidence demonstrates that MCIC intended to replace the RCAG plan with the MCIC plan even for RCAG employees, and therefore, even if plaintiffs remained RCAG employees until their severance—as found by the jury—they were not entitled to be paid under the RCAG plan. This argument fails for both procedural and substantive reasons.[1]

Second, defendants argue that the decision of the RCAG plan administrators to deny severance benefits to plaintiffs must be judged under an "arbitrary and capricious" standard. So viewed, defendants assert, that decision must be upheld. This argument cannot be sustained in view of both the wording of the severance plan and the grounds stated by the administrators for denial of benefits.

### 1. *The Asserted Termination of the RCAG Plan*

■ Federal Rule of Civil Procedure 50(a)(1) provides as follows:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a

motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

The standards for applying this rule are the same as under the predecessor rule, which governed motions for a directed verdict and for a judgment notwithstanding the verdict. *See, e.g., Piesco v. Koch,* 12 F.3d 332, 340 (2d Cir.1993). As the Second Circuit has recently summarized, "[w]hen faced with such a motion, the trial court must consider the evidence in the light most favorable to the nonmoving party and must 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" *Toltec Fabrics, Inc. v. August Inc.,* 29 F.3d 778, 782 (2d Cir.1994) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir.1988)). In doing so, "[t]he court is not allowed to weigh conflicting evidence, or assess the credibility of the witnesses, or substitute its judgment for that of the jury." *Id.* Judged by these standards, the motion must be denied "unless ... 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *Cruz v. Local Union No. 3 of the IBEW,* 34 F.3d 1148 (2d Cir.1994) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970)).

■ As is evident from the text of the rule and its elaboration by the courts, the Rule 50(a) remedy is addressed to issues that were the subject of the trial. Defendants' motion, however, insofar as it rests on trial evidence concerning the alleged termination of the RCAG plan, is mislabelled since the question of whether the RCAG plan had been terminated prior to plaintiffs' departure was not an issue at the trial. As noted, that question was determined as a matter of summary judgment three months before the trial. In-

---

[1] Defendants also reiterate an argument made on their summary judgment motion and rejected at the time, to the effect that MCIC's pre-closing intention to apply its own benefit plans to all employees within the MCI corporate family had the effect of terminating the RCAG plan as of the closing. This argument was rejected for reasons noted at some length in the court's prior decision, and I reject it here on the same basis.

deed, there can be no question as to this matter since the summary judgment decision explicitly held that the defendants had failed to demonstrate a triable dispute on this issue and then proceeded to limit the trial to two other factual issues, as to which the parties' summary judgment motion papers demonstrated triable questions.

Viewed in context, it is evident that defendants' application is, in substance, a motion for reconsideration of the court's prior summary judgment ruling based upon evidence received for different purposes at trial. There are obvious procedural problems with this effort, and in any event there is no substantive justification for the relief that is sought.

■ The initial hurdle is that defendants' motion, properly characterized, is both untimely and otherwise in violation of the local rule that governs such motions. The relevant provision is Rule 3(j) of the Civil Rules of this court, which provides that a motion for reconsideration "shall be served within ten (10) days after the docketing of the court's determination of the original motion." Although this time limit may not be jurisdictional *Hershfang v. Citicorp*, 1991 WL 197699, at *1 (S.D.N.Y. Oct. 1, 1991), it is enforced absent adequate justification for ignoring it. *See, e.g., Blanco v. United States*, 775 F.2d 53, 55–56 (2d Cir.1985); *see also Donahue v. Pendleton Woolen Mills*, 719 F.Supp. 149, 150 (S.D.N.Y.1988) (although motion was untimely, "in the interest of justice" court did not dismiss motion). In this case defendants offer no justification for their failure to meet the time limit or even to come remotely close to it. Indeed, defendants' motion papers are silent on this problem, and at oral argument their counsel conceded that, until shortly before the trial, defendants had simply overlooked the evidence on which they now rely. Since both the facts underlying the Board of Directors' decision and the documentation of it were uniquely in the control of defendants, this omission has not been explained and can hardly be justified. Indeed, if we assumed arguendo that the evidence otherwise might justify the relief sought, then the delay in producing it would be inexcusable since it resulted in an unnecessary seven-day trial.

■ Defendants' motion also fails to satisfy a second part of Rule 3(j). A motion for reargument is ordinarily limited to errors assertedly made by the court in its original decision, and it is not the vehicle for the losing party to submit additional evidence. *See Ades v. Deloitte & Touche*, 843 F.Supp. 888, 891–92 (S.D.N.Y.1994); *Collins Development Corp. v. Marsh & McLennan, Inc.*, 1991 WL 135605, at *4 (S.D.N.Y. July 18, 1991). *Cf. Transaero, Inc. v. La Fuerza Aerea Boliviana*, 38 F.3d 648 (2d Cir.1994) (applying Fed.R.App.P. 40(a)). Thus the rule specifies that the motion is to be based on a memorandum of law "setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." This limitation is further underscored by the provision that "[n]o affidavits shall be filed by any party unless directed by the court." As is evident, defendants' motion does not rest on the notion that the court "overlooked" facts or controlling law, since their argument relies on newly submitted evidence over which they have always had control. This failing equally demonstrates that defendants cannot justify a new trial on this question, much less their demand for judgment at this stage. *See Chang v. City of Albany*, 150 F.R.D. 456, 459 (N.D.N.Y.1993) (holding that a motion for a new trial will only be granted if the movant shows that the evidence was discovered since the trial); *Bradford Trust v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.Supp. 208, 213–14 (S.D.N.Y.1985), *aff'd*, 805 F.2d 49 (2d Cir. 1986).

■ Even if we were to disregard these procedural difficulties, we would be constrained to reject defendants' application on another procedural ground. Fed.R.Civ.P. 56(d) contemplates that a court faced with a summary judgment motion may conclude that full case-dispositive relief cannot be granted. In that circumstance it directs that

the court ... shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall therefore make an order specifying

the facts that appear without substantial controversy ... and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

The evident purpose of this rule is to "speed[ ] up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Fed.R.Civ.P. 56(d), Advisory Committee Notes (1946).

This is precisely the procedure followed by this court when it granted partial summary judgment before trial. If, however, a party could, in effect, ignore such a ruling and, after trial, sift the trial record for evidence that might have supported its position on issues decided before trial—as defendants seek to do here—the salutary purpose of the rule, to narrow the trial and define in advance the issues to be addressed there, would be defeated.

■ It is certainly true, as defendants argue, that a court may reexamine its Rule 56(d) rulings if sufficient cause is shown. *See, e.g.,* 6 Pt. 2 J. Moore *et ano., Moore's Federal Practice* ¶ 56.20[3.–3] at 56–701 & n. 10 (2d Ed.1993) (citing cases); *id.* ¶ 56.20[3.– 4] at 56–704 to 05 (citing *Coffman v. Federal Laboratories,* 171 F.2d 94, 98 (3d Cir.1948), *cert. denied,* 336 U.S. 913, 69 S.Ct. 603, 93 L.Ed. 1076 (1949)). *See generally* Fed. R.Civ.P. 54(b). Such a revision by the court must, however, be shown to be justified, *see, e.g., Audi Vision Inc. v. RCA Mfg. Co.,* 136 F.2d 621, 625 (2d Cir.1943) (change permitted at trial "to prevent manifest injustice"); *Moore's Federal Practice, supra,* at 56–707 (court should not alter ruling absent "good cause"), and it must be done on notice to the other parties, so that they understand that additional issues will be open for adjudication at trial and may prepare accordingly. As the Second Circuit has noted:

> Once a district judge issues a partial summary judgment order removing certain claims from a case, the parties have a right to rely on the ruling by forebearing from introducing any evidence or cross-examining witnesses in regard to those claims. If, as allowed by Rule 54(b), the judge subsequently changes the initial ruling and broadens the scope of the trial, the judge must inform the parties and give them an opportunity to present evidence relating to the newly revived issue.

*Leddy v. Standard Drywall, Inc.,* 875 F.2d 383, 386 (2d Cir.1989).

Defendants' effort to obtain judgment at this stage fails all of these tests. It does not seek to add an issue for trial, but rather seeks dispositive relief, and yet it does so in reliance on evidence that defendants offered at a trial that was expressly not conducted on the issue for which defendants now seek to invoke the evidence. Such an approach would deny plaintiffs notice and an opportunity to shape their trial presentation to meet an issue that they justifiably assumed was already settled. Moreover, defendants have made no showing of need or unfairness to justify their belated effort to snatch victory from the jaws of defeat. As noted, the evidence on which they rely was exclusively in their hands and knowledge at all times until the eve of trial, and they have not even attempted to explain their failure to produce it in a timely fashion. Moreover, even after their asserted belated discovery of the information shortly before trial, they did not then move for reconsideration of the court's summary judgment ruling or to expand the list of issues for trial. Indeed, they did not unveil their theory until the filing of their post-trial motion papers. In short, simply as a matter of procedural regularity and fairness, their motion must be rejected.

Finally, and most importantly, even if we were to ignore the foregoing considerations, the result would be the same since defendants' substantive argument is entirely meritless. As noted, the evidentiary record before the court on summary judgment contained no evidence that the RCAG plan had been terminated prior to the departure of plaintiffs in May 1988. The trial record is entirely consistent with the court's prior finding to this effect.

■ In seeking to challenge this conclusion, defendants point only to the fact that on June 28, 1988, well after all of the plaintiffs had been fired, the MCIC Board of Directors approved a consent that authorized the ex-

tension of the MCIC severance plan to all RCAG employees, effective retroactively at the closing. This additional information cannot change the original finding that defendants did not eliminate the RCAG plan prior to plaintiffs' termination. The underlying assumptions of defendants' argument are that an employer can retroactively reduce or eliminate its already-terminated employees' severance benefits and that the MCIC consent was intended to accomplish this end. Again, defendants' analysis misses the mark.

With regard to intent, defendants' proffered evidence, in the form of the document itself and the explanatory testimony of corporate counsel at trial, does not demonstrate that the consent was intended to terminate the RCAG severance plan. Indeed, according to defendants' own witness the purpose was simply "to allow any non-collective bargained employees of RCAG who might remain employed by RCAG to participate in the MCI Communications Corporation severance pay plan after the acquisition and to count their prior service with RCAG for the plan for purposes of calculating their benefit." (Tr. 975–76). In short, the consent was apparently intended to ensure continued coverage of any individuals who still remained as RCAG employees. (*See also* Tr. 977, 979 (noting MCIC concern that payment of MCIC benefits to non-participants would violate ERISA)). Plaintiffs, of course, did not remain, having long since been fired. In addition, whatever the intent of the Board, the consent did not purport either to terminate the RCAG plan or to apply the MCIC plan to RCAG. All that it did was to authorize the subsidiary to apply that plan, and the record is devoid of evidence as to whether RCAG ever adopted that plan.

In any event, even if we assumed that this evidence conclusively demonstrated that in late-June 1988 the MCIC Board of Directors acted to terminate the RCAG plan retroactively, such an effort would obviously be ineffective to divest the former employees of RCAG of their right to severance benefits under the RCAG plan. It is common ground that an employer is ordinarily free to alter or eliminate an employee welfare benefits plan at any time, absent a provision in the plan guaranteeing against such an eventuality. *See, e.g., Deibler v. United Food & Commercial Workers' Local Union 23,* 973 F.2d 206, 210 (3d Cir.1992); *Reichelt v. Emhart Corp.,* 921 F.2d 425, 430 (2d Cir.1990), *cert. denied,* 501 U.S. 1231, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991); *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 603 (7th Cir.1989). Nonetheless, once a triggering event occurs that entitles the employee to a specified benefit, the employer is contractually and statutorily obligated to provide that benefit and may not retrospectively amend the plan to divest the plan participant of a payment that he was already entitled to receive. Indeed, to conclude otherwise would entirely undermine the obligations imposed by ERISA upon a sponsor of a non-vesting benefit plan, since the employer could then ignore the requirements of the plan and, when sued, simply amend or terminate the plan retroactive to a date preceding the aggrieved participant's eligibility for benefits.

Not surprisingly, the courts have consistently held that an employer may not deny a benefit already earned, whether under a vested or a non-vested plan. *See, e.g., Wulf v. Quantum Chemical Corp.,* 26 F.3d 1368, 1378 (6th Cir.1994), *petition for cert. filed,* No. 94–750 (Oct. 25, 1994); *Pratt v. Petroleum Prod. Mgt., Inc. Employee Sav. Plan & Trust,* 920 F.2d 651, 661 (10th Cir.1990); *Adams v. General Tire & Rubber Co.,* 794 F.2d 164, 166–67 (4th Cir.1986); *Harm v. Bay Area Pipe Trades Pension Plan Trust Fund,* 701 F.2d 1301, 1305–06 (9th Cir.1983); *Kemmerer v. ICI Americas, Inc.,* 842 F.Supp. 138, 142–46 (E.D.Pa.1994); *Edward W. Sparrow Hosp. Ass'n, Inc. v. Industrial Welding, Inc.,* 1990 WL 599020, at * 7, 1990 U.S. Dist. LEXIS 9194, at * 20 (W.D.Mich. 1990). *See also New York State Teamsters Conf. Pension & Retirement Fund v. Hoh,* 561 F.Supp. 679, 684 n. 8 (N.D.N.Y.1982) (citing cases). As one court has noted: "allowing [the employer] to unilaterally terminate Plan benefits retroactively renders the Plan illusory. Carried to an extreme, [the employer] could terminate benefits for claims already incurred and paid out. Although … [the employer] properly reserved the right to amend its Plan, including the right to terminate benefits, this right does not encompass

claims that have already been incurred." *Edward W. Sparrow Hosp. Ass'n, Inc. v. Industrial Welding, Inc.*, 1990 WL 599020, at * 7, 1990 U.S.Dist. LEXIS at *20.[2]

In this case plaintiffs' entitlement to a lump-sum payment under the RCAG plan accrued at their termination in May 1988. Necessarily, then, the June 28, 1988 consent approved by the MCIC Board could not divest them of that entitlement, and hence defendants' argument for judgment based on that consent is legally insupportable.[3]

## 2. The Standard of Review of the Administrator's Denial of Benefits

■ Defendants also seek judgment as a matter of law on the theory that the decision to deny benefits under the RCAG plan should be subjected to a deferential standard of review. This issue was previously raised by defendants in connection with the court's rulings on their requests to charge, and at that time the court rejected defendants' argument. (Tr. 1165–70). Having reviewed defendants' motion papers, I conclude that the argument has not improved with repetition.

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956–57. Thus we must look to the terms of the plan to determine whether and in what circumstances the plan administrator is given such discretionary authority. *See, e.g., Masella v. Blue Cross & Blue Shield of Connecticut*, 936 F.2d 98, 103 (2d Cir.1991). In doing so, we bear in mind the admonition that "discretion is *not* an all-or-nothing proposition. A plan can give an administrator discretion with respect to some decisions, but not others.... A plan administrator has exactly the amount and type of discretion granted by the plan, no more and no less." *Wulf v. Quantum Chemical Corp.*, 26 F.3d at 1373 (quoting *Anderson v. Great West Life Assur. Co.*, 942 F.2d 392, 395 (6th Cir.1991) (emphasis in original)). *See also Kirwan v. Marriott Corp.*, 10 F.3d 784, 788–89 (11th Cir.1994).

In this case the RCAG Summary Plan Description contains no provision purporting to invest the plan administrator with any discretion. (Pl. Exh. 1). The only provision cited by defendants is found in the so-called "Procedure" for the plan, which simply provides, under the heading "Responsibility and Administration", that "[t]he Vice President, Employee Relations, or his designee, will render any interpretation of this Policy that may be required." (Pl. Exh. 2 at p. 4). It could well be argued that this language does not sufficiently articulate a grant of discretion to invoke deferential review in any respect. *See, e.g., Rovira v. AT & T*, 817 F.Supp. 1062, 1068 (S.D.N.Y.1993) (ambiguities resolved against plan administrator); *Clark v. Bank of New York*, 801 F.Supp. 1182, 1189 (S.D.N.Y.1992) (defendant's bur-

---

**2.** Defendants cite no legal authority for the proposition that accrued benefits can be retroactively denied by the plan administrator. At oral argument, defendants' counsel, when asked for support for this proposition, invoked only *Biggers v. Wittek Industs., Inc.*, 4 F.3d 291 (4th Cir.1993), a decision that neither addresses the retroactivity question nor supports defendants' case in any other respect. Indeed, the principal holding of *Biggers* is that a welfare benefits plan that does not specify a procedure for amendment cannot be deemed altered to the detriment of the participants absent both a writing and "a clear manifestation of an intent to alter the policy or plan." *Id.* at 295–96. For reasons noted in the summary judgment decision, defendants' assertion that the RCAG plan was replaced by the MCIC plan prior to plaintiffs' termination is supported by neither a writing nor any clear indication that the RCAG plan was superceded for RCAG employees in plaintiffs' category. Indeed, it bears noting that the evidence concerning the action of the MCIC Board of Directors in June 1988—to which we have previously adverted—suggests precisely the contrary.

**3.** The legal inadequacy of defendants' argument also precludes our treating it as a request for a new trial, since plaintiffs have shown no basis to question the court's pre-trial conclusion that the RCAG plan had not been terminated as of the time when plaintiffs were fired. As for defendants' articulated grounds for a new trial, I address them in a subsequent section of this decision.

den to show that it has discretionary authority); *Arthurs v. Metropolitan Life Ins. Co.,* 760 F.Supp. 1095, 1098 (S.D.N.Y.1991). *See generally Masella v. Blue Cross & Blue Shield of Connecticut,* 936 F.2d at 103 (comparing different formulations of authority assigned to plan administrator). We need not address that question, however, since the plan, even if generously interpreted in defendants' favor, does not grant the plan administrator or his designee the type of discretion that would cover the decision actually rendered on plaintiffs' applications for benefits.[4]

By its own terms, the quoted provision gives the RCAG Vice–President discretion, if at all, only to interpret the plan. It does not purport to give the RCAG Vice–President any separate grant of discretion to determine eligibility for benefits. *Compare, e.g., Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1141 (3d Cir.1993), *cert. denied,* —— U.S. —— & ——, 114 S.Ct. 1369 & 1540, 128 L.Ed.2d 46 & 192 (1994); *Miller v. United Welfare Fund,* 851 F.Supp. 71, 74 (E.D.N.Y.1994); *Zisel v. Prudential Insur. Co. of America,* 845 F.Supp. 949, 951 (E.D.N.Y.1994). Thus, that provision, whatever its legal significance, is not triggered here.

RCAG advised plaintiffs through their counsel that benefits were being denied because the plan had been terminated. (Pl's Exh. 43). This conclusion did not rest on the administrator's interpretation of any provisions of the plan; indeed, the plan contained no provisions governing the method of its termination or modification. Rather, the question of whether the plan had been terminated turns on an analysis of caselaw interpreting ERISA and principles of corporate law (*see Algie v. RCA Global Communications, Inc.,* 1994 WL 132358, at *20–24), and that is not an exercise that is committed by the plan to the discretion of the plan administrator.

Since the RCAG plan administrator did not exercise any discretion that he may have had when he denied plaintiffs their severance benefits, it follows that his decision is not

entitled to deference. *See, e.g., Kinek v. Gulf & Western, Inc.,* 720 F.Supp. 275, 281–82 (S.D.N.Y.1989), *aff'd sub nom. Kinek v. Paramount Communications, Inc.,* 22 F.3d 503 (2d Cir.1994). Hence, insofar as defendants' Rule 50(a) motion is premised on the notion that such deference is owed, the motion is denied.

**B. *Defendants' Motion for a New Trial***

Defendants alternatively seek a new trial, citing three asserted errors in the court's charge. This argument is in part unpreserved and in any event groundless.

Defendants first complain because, they say, the court did not incorporate two of their proposed charges governing the formation of the employment relationship. One of these requests (no. 17), entitled *"Employment Status After Acquisition—Partial Performance"*, summarized a variety of assertedly relevant considerations in evaluating whether plaintiffs were employed by RCAG or by MCII immediately after the stock sale of RCAG, including particularly "whether one party has partially performed [an employment agreement] and that performance has been accepted by the other party." (*See* Defs.' Request to Charge at 23). The proposed instruction mentioned other factors as well (*id.* at 23–24), but gave particular prominence to the notion that "partial performance is an unmistakable signal that" the performing party believes that there is a contract between the parties and that acceptance of performance indicates that both sides recognize such a contractual relationship. (*Id.* at 23).

The second cited request on this general topic (no. 18) was entitled *"Employment Status After Acquisition—Automatic Employment Upon Stock Sale"*. (*Id.* at 25). It would have instructed that, upon a stock sale, "the employees of the company which is sold can automatically become employees of the purchasing company." In explanation, the proposed instruction said, in substance, that

---

4. It could also be argued that since the Summary Plan Description, which was the explanatory document made available to plan participants, contains no reference to even this limited interpretive authority of the designated RCAG Vice-

President, the provision in the "Procedure" is of no effect. *See, e.g., Heidgerd v. Olin Corp.,* 906 F.2d 903, 907–08 (2d Cir.1990); *Clark v. Bank of New York,* 801 F.Supp. at 1190. Again, however, we need not decide that question here.

no written offer of employment was required and that "employment by the purchasing company may be inferred." Finally, it reiterated that "you may find from the evidence that the Plaintiffs became MCII employees immediately upon acquisition, whether or not Plaintiffs received written employment offers in the form of letters or contracts." (*Id.*)

■ Defendants' complaint about the first of these two charges fails on both procedural and substantive grounds. After receipt of both sides' requests to charge, the court prepared a written draft charge and supplied it to counsel the day before the charge conference. (Tr. 989–90, 1088–89, 1096). At the charge conference, the court entertained all objections and requests for modification of the charge. (Tr. 1096–1164). During the course of that colloquy defendants' counsel did not refer to or suggest any problems relevant to request no. 17. At the conclusion of the colloquy, defense counsel sought to invoke "a continuing exception" for any requested charge not specifically incorporated by the court. (Tr. 1164). In response the court advised that if counsel had any requests that she believed had not been satisfied, she should specify them so that the court could determine whether it had inadvertently omitted an instruction or whether defendants' version of a requested charge was preferable. (Tr. 1164). Counsel then cited four specific proposed instructions (Tr. 1164–65), but never mentioned request no. 17 specifically or in substance. (Tr. 1172). Similarly, after the charge was given, although both sides were afforded the opportunity to voice any objections, defendants never mentioned this request. (Tr. 1271).

■ If a party does not object specifically to a charge that is given or to the failure to give a requested charge, as required by Fed. R.Civ.P. 51, he is generally deemed to have waived the point, and such waiver is forgiven only if the charge as given constituted "plain error". *See, e.g., Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993) (citing cases). In this case the charge as given did not constitute error, whether plain or otherwise. Indeed, the court instructed the jury in accordance

with the substance of defendants' request no. 17, but without the unbalanced language found in the requested charge.

As explained by defendants, request no. 17 was designed to acknowledge defendants' contention that the jury could infer that the payment by MCII of substantial benefits to plaintiffs and plaintiffs' acceptance of those payments demonstrated the existence of an employment relationship with MCII. The court accepted this principle and so instructed the jury. Thus, after telling the jury that an employment relationship did not need to be embodied in a writing and did not depend upon any specific exchange of words between the employee and the putative employer, the court advised that such a relationship "may be inferred from less specific words and may also be inferred from a combination of words and actions of the would-be employer and employee." (Tr. 1250). In explanation, the court went on to state:

> In assessing this question, you may take into account ... all of the statements and actions of the defendants prior to the closing that were made known to the plaintiff, as well as any statements and actions by [the] plaintiff prior to the closing. You may also take into account any subsequent statement and conduct by the parties that sheds light on whether MCI International offered the plaintiff employment and whether plaintiff's reporting for work after the closing and his acceptance of monies and benefits from MCI International amounted to acceptance by him of an offer to work for MCI International instead of RCA Global.

(Tr. 1251). This instruction, a portion of which was suggested by defendants during the charge conference (Tr. 1137–39), explicitly embodies the heart of defendants' request no. 17, and gave defendants an ample basis to argue to the jury, as they did, that plaintiffs' pre-closing signing of MCIC benefit enrollment cards and their receipt of various benefits from MCII after the closing demonstrated an offer and acceptance of employment. (Tr. 1188–90).

■ A party is not entitled to a charge in the precise words of its request. *See, e.g., Riverwoods Chappaqua Corp. v. Marine*

*Midland Bank,* 30 F.3d 339, 346 (2d Cir. 1994). *See also* 1 Edward J. Devitt, Charles B. Blackmar, Michael A. Wolff, and Kevin F. O'Malley, *Federal Jury Practice & Instructions* § 7.02 at 211 (1992). In this case defendants received the substance of their request, and the court properly exercised its discretion not to use the wording that defendants had formulated, which implied that the payment of benefits by MCII was virtually dispositive of the employment question, and instead chose to give a more balanced charge, which invited the jury in general terms to consider all of the pertinent factors, including the payment and receipt of benefits, without suggesting that any one was necessarily controlling.

▇ As for proposed charge no. 18, in substance it advised the jury that the formation of an employment relationship does not require a writing. (Defs.' Requests to Charge at 25). To that extent, as we have seen, the charge was given very explicitly. (Tr. 1247–50) (repeatedly stating employment agreement need not be in writing and may be implied from words and actions).

The court altered the charge only in one respect, by omitting the statement that an employment relationship may arise "automatically" following the stock purchase of the prior employing corporation. This aspect of the requested charge was both confusing and misleading. It was confusing because it did not indicate in what circumstances a change of employment status would occur "automatically" after a stock purchase. It was misleading in that it implied that a new employment relation would occur automatically upon such a stock purchase, that is, without any actions by either the employee or the purchaser that would suggest some form of implicit employment agreement. This is a reiteration of one of the legal theories pressed by defendants on their summary judgment motion and rejected by the court because it is inconsistent with the presumed independence of a parent and subsidiary. (*See Algie*

*v. RCA Global Communication, Inc.,* 1994 WL 132358 at *25–27).[5]

In sum, request no. 18 was given in substance, and was modified only to avoid the insinuation of a legally erroneous theory. Defendants have no legitimate complaint about this result.

▇ Defendants' last argument for a new trial involves the failure of the court to give their proposed request no. 19. This charge in substance would have instructed the jurors that if, after the closing, MCII controlled the employment practices of RCAG or operated RCAG and MCII "as one corporation", "you may find that RCAG employees, including Plaintiffs, became MCII employees upon the acquisition. . . ." (Defs.' Requests to Charge at 26).

Again, defendants failed to object to the omission of this charge, and therefore the objection is waived absent a showing of plain error. In any event, the refusal to give this instruction was proper and hardly plain error.

In substance defendants sought to disclaim a corporate responsibility of the subsidiary by using an alter-ego or veil-piercing theory. This effort by defendants to use their claimed disregard of corporate independence in order to benefit themselves is unsupported by case law and contrary to the underlying rationale for the alter-ego and veil-piercing doctrines.

▇ The corporate form is a fiction that is recognized to protect the shareholders from being exposed to the risk of personal liability for the obligations of the corporation. This rule is given legal effect as a means of encouraging corporate investment by minimizing the investor's risk. *See, e.g., Labadie Coal Co. v. Black,* 672 F.2d 92, 96 (D.C.Cir. 1982); Hackney & Benson, *Shareholder Liability for Inadequate Capital,* 43 U.Pitt.L.Rev. 837, 872 (1983). By the same token, the benefit of insulation from corporate liability is granted only on condition that

---

**5.** Defendants incorrectly assert that the court rejected the instruction in part because it conveyed the notion that an employment relationship could be formed without a writing. That was not the basis for the court's ruling, the grounds for which were specifically outlined at the charge conference. (Tr. 1131–34). Moreover, as noted, the court's charge repeatedly advised the jury that no writing was required. (Tr. 1247–50).

the shareholders of the corporation maintain the formalities of corporate form and independence, and if they fail to do so, they risk the loss of their insulation from obligations of the corporation. *See, e.g., William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600–01 (2d Cir.1989); *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988).

When viewed in this context, we can readily understand why alter-ego and veil-piercing theories have been invoked to benefit those parties seeking to impose liability on the corporation or its shareholders. The one case cited by defendants as legal authority for their requested charge, *Johnson v. Flowers Industs., Inc.*, 814 F.2d 978 (4th Cir. 1987), illustrates this point. In *Johnson* the plaintiffs sued their employer, its parent corporation and another subsidiary of the parent for age discrimination. The immediate issue was whether, in seeking to demonstrate discrimination in their termination, the plaintiffs could use data reflecting hiring decisions by the other subsidiary. To do so, plaintiffs were required to demonstrate that the parent, which concededly controlled the plaintiffs' employer, also controlled the employment decisions of the other subsidiary. The circuit court affirmed the dismissal of the complaint because the plaintiffs had failed to demonstrate such control. *Id.* at 979–82.

As in *Johnson*, other courts employing this form of alter-ego analysis in employment discrimination and related types of cases have consistently applied it as a means to uphold or extend corporate liability. *See, e.g., Armbruster v. Quinn*, 711 F.2d 1332, 1335–39 (6th Cir.1983); *Weinreich v. Sandhaus*, 850 F.Supp. 1169, 1178–79, *amended in part*, 156 F.R.D. 60 (S.D.N.Y.1994); *United States v. Nagelberg*, 772 F.Supp. 120, 124 (E.D.N.Y. 1991). In contrast, defendants' proposed instruction would reverse the thrust and rationale of the alter-ego and corporate-veil-piercing principles. In substance, both RCAG and MCII would benefit if they ignored corporate formalities, and their non-compliance with corporate law requirements would deprive the plaintiffs of the benefits to which they would otherwise be entitled. This per-

verse use of these doctrines is unprecedented, and, given the reason for those rules, the lack of precedent is scarcely surprising. Indeed, one of the cases cited by defendants makes it plain that this theory is not legally tenable. Thus, in *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739 (7th Cir.1989), the circuit court observed that "the accepted rule is that the corporate veil will only be pierced to protect the interests of third parties; the separate corporate entity will not be disregarded to allow the corporation to escape its obligations." *Id.* at 751.

Defendants' proposed jury charge on corporate control fails for still another reason as well. The plaintiffs were all given their termination notices and told to leave the premises within one to three days after the closing. Whatever evidence may be found in the record relating to possible control of RCAG by any of the other MCI corporate entities— such as the failure over time to appoint an RCAG Board of Directors or MCIC's dealings with the union representing RCAG's unionized employees—involves a longer and later time period. Moreover, the fact that MCII personnel may have been involved in the pre-closing decision as to which RCAG employees would be retained as MCII workers does not demonstrate or even suggest that MCII formed an employment relationship with those RCAG personnel who were not selected for retention.

In sum, defendants' request no. 19 was unsupported by the law and inconsistent with the trial evidence. Accordingly, its rejection by the court does not warrant a new trial.

## II. Plaintiffs' Application for Fees and Pre–Judgment Interest

In the wake of their success at trial, plaintiffs have moved for an award of fees and costs and also seek pre-judgment interest calculated at an annual rate of nine percent. I address each of these applications separately.

### A. Fees and Costs

In authorizing civil suits by plan participants, ERISA grants to the district court the discretion to award fees and costs. Specifically, it states:

In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

29 U.S.C. § 1132(g)(1).[6]

■ Although the statute gives the court some discretion as to whether to award fees and costs and to whom, the Second Circuit has noted that "ERISA's attorney's fee provisions must be liberally construed to protect the statutory purpose of vindicating retirement rights...." *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 872 (2d Cir.1987), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990). To channel the exercise of the trial court's discretion, the Circuit Court has generally limited awards to a prevailing party, even though the statute does not so provide, *see, e.g., Weil v. Retirement Plan Admin. Committee of Terson Co.,* 913 F.2d 1045, 1052 (2d Cir.1990) (citing cases), *vacated in part on other gds.,* 933 F.2d 106 (2d Cir.1991), and has adopted a five-part test to govern the assessment of eligibility for such an award. *See, e.g., Mendez v. Teachers Ins. & Annuity Ass'n,* 982 F.2d 783, 788 (2d Cir.1992). These factors include the following:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Id.* at 788 (quoting *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d at 871). My assessment of the relevant concerns in this case leads to the conclusion that an award of fees is appropriate.

At the outset, it is plain that plaintiffs are the prevailing parties. Although this may seem self-evident, defendants make an effort to argue to the contrary, observing that during the course of the litigation plaintiffs asserted as many as six claims and ultimately prevailed on only one. This approach is inconsistent with governing law.

■ The minimum requirement for a fee award is that the plaintiff have obtained some relief under ERISA. *See, e.g., Weil v. Retirement Plan Admin. Committee of Terson Co.,* 913 F.2d at 1052; *Fase v. Seafarers Welfare & Pension Plan,* 589 F.2d 112, 116 (2d Cir.1978). Plaintiffs have obviously satisfied that requirement since they have vindicated their central contention in this case, that they were entitled to be paid severance benefits in accordance with the RCAG severance plan. Although they have advanced a variety of legal claims in this case, all were related to the denial of those benefits by the defendants, and thus whether they prevailed on some or all of their theories is inconsequential for the question of fee entitlement.[7] If a plaintiff prevails on his principal claim he is the prevailing party, particularly in view of "the statutory purpose of vindicating retirement rights...." *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d at 872. *Cf. Farrar v. Hobby,* —— U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1993) (plaintiff who receives nominal damages is "prevailing party" under 42 U.S.C. § 1988).

■ As for the "five-factor test", *New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno,* 18 F.3d 179, 183 (2d Cir.1994), the first criterion turns on "the degree of the offending party's culpability or bad faith." *Mendez v. Teachers Ins. & Annuity Fund,* 982 F.2d at 788. In view of the disjunctive wording of this phrase, it is apparent that the plaintiffs need not prove bad faith or malicious intent to

---

6. The cited exception, found in paragraph (2), requires the award of fees to the fiduciary of a plan who successfully sues on behalf of the plan for delinquent contributions. 29 U.S.C. § 1132(g)(2).

7. Depending upon the degree of interrelatedness of these claims, plaintiffs' lack of success on some of their theories might affect the amount of the fees to be awarded. *See generally Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 558–61, 106 S.Ct. 3088, 3094–96, 92 L.Ed.2d 439 (1986).

satisfy it. As recently summarized by the Third Circuit:

> [a] losing party may be culpable ... without having acted with an ulterior motive. In a civil context, culpable conduct is commonly understood to mean conduct that is "blameable; censurable; ... at fault; involving the breach of a legal duty or the commission of a fault.... Such conduct normally involves something more than simple negligence.... [It] implies that the act or conduct spoken of is reprehensible or wrong, but not that it involves malice or a guilty purpose."

*McPherson v. Employees' Pension Plan of American Re–Insurance Co.,* 33 F.3d 253, 256–57 (3d Cir.1994).

If we look at defendants' conduct both at the time of the denial of benefits and during the litigation, it is difficult to find them guilty of bad faith. Nonetheless, their record is not entirely free from legitimate criticism.

 Among other things, plaintiffs accuse defendants of corporate immorality, or at least ingratitude, because they chose, as part of the corporate takeover of RCAG, not only to abruptly terminate numerous employees who had worked for the company for many decades, but to deprive them of a portion of the severance benefits to which they would otherwise have been entitled. This does not amount to the type of bad faith or culpability envisaged in the first of the attorney-fee criteria.

There is little doubt that if defendants in fact wanted to minimize the amount of severance benefits payable to plaintiffs, they could have done so through proper procedures. Their failure in this respect may be attributable to an inattention to detail, most notably the failure to amend or eliminate the RCAG plan before the termination, and the accompanying haste to get rid of the 100 or so RCAG employees who were not offered jobs with MCII. Whatever one may think about the wisdom or morality of the 1980s trend to corporate acquisitions and accompanying mass layoffs—of which the events in this case

are but one small example—such decisions are beyond the reach of ERISA.[8] The only pertinent concern for us is whether the decision by the plan administrator to deny benefits to plaintiffs once they applied, and the defendants' persistence in that decision throughout the course of the litigation, smack of bad faith or culpability.

The initial corporate decision to deny benefits has not been shown to reflect anything other than the honest, if mistaken, assumption by corporate officials that the RCAG plan had in fact been terminated. Moreover, in fairness, we must note that after the acquisition plaintiffs were paid significant benefits under a variety of plans that applied to MCII employees, a fact strongly suggesting that MCIC and MCII assumed that plaintiffs had been, at least for a few days, employees of MCII and thus entitled to MCIC benefits by virtue of that status. This conduct alone is simply insufficient to weight the first criterion in favor of fees.

 Plaintiffs also cite, as relevant to the first criterion, the subsequent behavior of defendants, who continued to refuse to make the requested payments while repeatedly changing their stated grounds for this decision. This complaint has some basis.

In their response to plaintiffs' letter claims for benefits, defendants appeared to concede that plaintiffs had remained RCAG employees until May 30, 1988, but asserted that the RCAG plan had been terminated as of the closing, two weeks earlier. Once defendants were alerted to the fact that some of the former RCAG plaintiffs were pressing a demand for RCAG benefits, however, they were surely under an obligation to consider carefully whether that plan had in fact been terminated. Yet in response to plaintiffs' written request under 29 U.S.C. § 1024 for any documents by which the termination had been accomplished, defendants produced nothing. Moreover, the last CEO of RCAG, Mr. Valerian Podmolik, testified in deposition that the plan had not been terminated as of

---

**8.** Similarly beyond the scope of our analysis is the evident abruptness and arguable callousness shown by MCI officials in the manner in which they chose to inform plaintiffs and others target-

ed for layoffs that they were being fired and had one hour to collect their possessions and leave the premises.

the closing, a fact that defendants could presumably have discovered for themselves.

Defendants persisted in this position during the litigation but varied their theory as to how the termination had occurred. Thus, at one point they cited a January 1988 resolution of the RCAG Board, which plainly terminated RCAG's participation in other plans but did not refer to the severance plan. At other times they invoked the closing documents, which also did not address the matter in any respect. Alternatively, they cited the December 1987 orientation meetings held by MCI officials with RCAG employees concerning the coverage that they would receive as MCII employees, even though defendants themselves argued that MCII had no authority at that time to make corporate decisions for RCAG.[9]

Ultimately, on summary judgment it became apparent that defendants had no evidentiary basis for their various assertions as to how the RCAG plan had been terminated, and accordingly partial summary judgment was granted for plaintiffs on this issue. This persistence in pressing varying explanations for an event that defendants ultimately could not document is plainly relevant to culpability.

The other significant inconsistency in defendants' position was their about-face on whether plaintiffs were still RCAG employees when terminated. As noted, defendants originally so represented when responding to claim letters from plaintiffs' counsel. Subsequently, however, in the course of this litiga-

tion they reversed field and, perhaps sensing the problems with their shifting explanation of the purported termination of the RCAG plan, began to argue that plaintiffs had automatically become MCII employees as of the closing. Ultimately the court rejected this theory of an automatic switch of employers based simply on a stock purchase (see *Algie v. RCA Global Communication, Inc.,* 1994 WL 132358, at *26), but sent the employment issue to trial based on the existence of disputed factual questions as to the relevant circumstances.

These alternative and shifting theories were presumably a reflection of able and creative counsel doing their job in representing defendants in this lawsuit, and defense counsel cannot be criticized for these efforts. Nonetheless, we must remember that defendants are charged with responsibilities of a fiduciary nature in regard to plans that they have created and administer, and it is fair to construe the "culpability" test as implicitly recognizing those responsibilities when assessing the defendants' conduct, even in the lawsuit. On that basis I conclude that, viewed in context, defendants' conduct in this matter was, at least to some modest degree, culpable and that the first criterion thus weighs slightly in favor of a fee award.[10]

The second fee criterion is the defendants' ability to satisfy a fee award. Defendants concede that this test is met here.

The third criterion looks to whether an award would tend to deter others from en-

**9.** As an accompaniment to this argument, defendants invoked the fact that in March 1988 plaintiffs and other RCAG employees received and signed MCIC benefit enrollment cards, but this fact was ultimately more pertinent to defendants' trial contention that plaintiffs had agreed to become employed by MCII as of the closing. At trial, however, this point appeared to founder because defendants' own officials admitted that neither the plaintiffs nor any other RCAG employee had been told at the December 1987 meetings or at any other time before the closing that they might or would be fired immediately after the closing.

**10.** Plaintiffs make the further point that defendants took a number of positions in the lawsuit that had no legal or factual basis. This is certainly true, the most notable example being defendants' insistence, in their summary judgment

motion, that plaintiffs' claim for benefits was barred by collateral estoppel as a result of a decision by the Ninth Circuit in a lawsuit by five other former RCAG employees against MCI. As indicated in the summary judgment decision, defendants' estoppel argument was premised on a factual assumption that was demonstrably false— the assumption concerned the claimed participation by these plaintiffs' counsel in the California lawsuit—and on a legal theory that was entirely untenable. Nonetheless, in fairness I note that plaintiffs have also occasionally taken unsustainable positions, as evidenced by the dismissal or withdrawal of five of plaintiffs' six claims. There may often be a rather fine line between finding culpability on such a basis and simply second-guessing counsel. There is no need in this case to attempt to tread near that line, and I therefore decline to do so.

gaging in similar behavior. This concern is presumably most relevant when a defendant has engaged in misconduct, but it can surely be applied even when the defendant does not act in bad faith. *See, e.g., McPherson v. Employees Pension Plan of American Re-Insurance Co.,* 33 F.3d at 258. Moreover, we may consider the potential deterrent effect on all employers, not just the defendants. *See, e.g., Pagovich v. Moskowitz,* 865 F.Supp. 130, 139 (S.D.N.Y.1994); *Engineers Joint Welfare Funds v. B.B.L. Constructors, Inc.,* 825 F.Supp. 13, 18 (N.D.N.Y.1993).

It is certainly true, as defendants contend, that this case involves an unusual fact pattern, but that does not speak to whether a fee award would deter undesirable behavior by other employers that bears at least some relationship to the events here. The conduct of the defendants that we have found somewhat culpable includes a fairly cavalier and even careless approach to assessing the status of an acquired company's welfare benefits plan, a problem that may have resulted in part from a failure to include in the plan a provision defining the mechanism for its modification, as required by ERISA. The undesirable conduct also involves a failure to assess clearly at an early stage whether there was an adequate justification for denying a request for benefits and, if so, what that justification was. These types of failings appear not to be uncommon in ERISA cases, and a fee award would presumably act as at least a modest deterrent to future failings of this type.

The fourth criterion looks to the relative merits of the parties' respective positions. Defendants' basic position in the lawsuit—that plaintiffs became MCII employees at the time of the closing—was, at least in one guise, not legally or factually frivolous, but that is not tantamount to a demonstration that the parties' positions were evenly balanced. Defendants resisted an award of benefits either (1) because the RCAG plan had been terminated as of the closing or (2) because plaintiffs had become MCII employees just after the closing. Defendants' first contention was demonstrated to be so factually unsupported that it could be rejected as a matter of summary judgment. Defendants' second contention, insofar as it rested on the assumption that a stock purchase automatically converts the purchased corporation's employees into employees of the purchasing corporation, was also legally untenable. As for the other version of this theory, that under all of the circumstances plaintiffs had become MCII employees, it was sufficiently factually grounded to force a trial, but the evidence at trial certainly supported the jury's conclusion that plaintiffs had, as defendants originally conceded, remained RCAG employees until their termination.

In sum, plaintiffs' basic position in this litigation—that they were entitled to severance benefits measured by the RCAG rather than the MCII plan—was supported by the law and the evidence.[11] Accordingly, the fourth factor also supports an award of fees.

The last criterion asks whether the lawsuit conferred a common benefit on a group. That is surely the case here, for two reasons.

First, we must remember that this case involved twenty-three former employees of RCAG, all of whom had been denied the more generous severance benefits of the RCAG plan. That all of these individuals were parties to the lawsuit does not undercut the fact that the benefits of the suit flow to a substantial number of similarly situated individuals. To rule otherwise would surely exalt form over substance, since the logic of such a position would suggest that if only one of the plaintiffs had litigated the issue here, and the rest had filed separate lawsuits that were stayed to await the result in this one, fees would be appropriate. Such a distinction cannot be justified by any articulable policy, and indeed it runs counter to the policy, embodied in Fed.R.Civ.P. 20, of encouraging the joinder as plaintiffs of persons with the same or related claims.

Second, the plaintiffs in this case have sought to resolve a number of legal issues

---

**11.** It is true that neither the parties nor the court could find caselaw directly on point on the dispositive issue. Nonetheless, we are accustomed to reasoning from cases whose factual context is sufficiently analogous to permit extrapolation to our case. Such reasoning by analogy provided a solid base from which to make decisions in this case.

that are potentially significant in other ERISA controversies. This factor is relevant to the "common benefit" concern. *See, e.g., Continental Assur. Co. v. Cedar Rapids Pediatric Clinic,* 957 F.2d 588, 594 (8th Cir. 1992); *Plumbers & Steamfitters Local 150 v. Vertex Constr. Co.,* 932 F.2d 1443, 1453 (11th Cir.1991); *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1301 (6th Cir.1991); *Anita Foundations, Inc. v. ILGWU Nat'l Retirement Fund,* 718 F.Supp. 244, 246 (S.D.N.Y.1989), *aff'd,* 902 F.2d 185 (2d Cir.1990). The issues of general significance included questions relating to whether the plan must contain provisions specifying a procedure for modification and the effect of a failure to include such procedures; what degree of formality must attend the termination of a welfare benefits plan; whether deference is owed to an administrator's denial of benefits when his articulated reasons do not come within the scope of explicitly granted discretion under the plan; whether a plan participant is barred from recovery of benefits as a matter of collateral estoppel because other, similarly situated plan participants have lost in a separate suit on similar facts and related legal theories; and whether a claim for a lump-sum payment of benefits is triable to a jury at the plaintiff's request.

In sum, all five criteria lend at least modest support to plaintiffs' demand for an award of fees, and most of them strongly support that request. The application is therefore granted, and I now turn to the amount of the award.

Plaintiffs seek an award of $592,292.00 in fees and $53,730.37 in expenses. The fees are said to represent over 2,500 hours of work by six attorneys at current hourly rates ranging from $150.00 to $300.00, more than 68 hours of work by a summer associate at $75.00 per hour, and more than 244 hours of labor by three paralegals whose time is billed at $65.00 per hour. (*See* Affirmation of John C. Lankenau, Esq., executed Aug. 9, 1994, at ¶ 7 & Exh. A; Reply Affirmation of John C. Lankenau, Esq., executed Sept. 26, 1994, at ¶ 29 & n.* & Exh. S). As for the listed expenses, plaintiffs represent that $7,704.50 of the total constitutes taxable costs under Fed.R.Civ.P. 54(d)(1) and S.D.N.Y. Civil Rule 11. (Lankenau Aff. at ¶ 13.)

We start with certain basic precepts that govern the measurement of fee awards generally and have been applied to ERISA. The ordinary process for determining an award of fees involves calculation of the so-called "lodestar" figure. *See, e.g., Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 944–45, 103 L.Ed.2d 67 (1989); *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). "Under this approach, the number of hours reasonably expended on the litigation is multiplied by a reasonable hourly rate for attorneys and paraprofessionals." *Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993). *Accord, e.g., Clarke v. Frank,* 960 F.2d 1146, 1153 (2d Cir.1992).

To determine the number of hours that are properly compensable, the court must initially look to the amount of time spent on each category of tasks, as documented by contemporaneous time records of the moving party's attorneys. *See, e.g., T.E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 528 (2d Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990); *Miele v. New York State Teamsters Conf. Pension & Retirement Fund,* 831 F.2d 407, 408 (2d Cir.1987). The court must then determine how much of that time was "reasonably" spent. "In calculating the number of 'reasonable hours,' the court looks to 'its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.'" *Clarke v. Frank,* 960 F.2d at 1153 (quoting *DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985)). If the court concludes that portions of the expended time were not reasonably necessary to achieve the successful result obtained by the movant, it should reduce the time for which compensation is awarded. *See, e.g., Hensley v. Eckerhart,* 461 U.S. at 434–35, 103 S.Ct. at 1939–40; *Clarke v. Frank,* 960 F.2d at 1153; *Cowan v. Prudential Ins. Co. of America,* 935 F.2d 522, 524 (2d Cir.1991). Such reductions are appropriate to account for work on claims unrelated to those on

which the movant ultimately prevailed, *see, e.g., Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. at 558–61, 106 S.Ct. at 3094–96; *Chambless v. Masters, Mates & Pilots Pension Plan,* 697 F.Supp. 642, 648 (S.D.N.Y.1988), *aff'd in relevant part,* 885 F.2d 1053 (2d Cir.1989), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990), or for plainly inefficient or duplicative labor. *See, e.g., City of Riverside v. Rivera,* 477 U.S. 561, 578 n. 9, 106 S.Ct. 2686, 2696 n. 9, 91 L.Ed.2d 466 (1986); *Hensley v. Eckerhart,* 461 U.S. at 434, 103 S.Ct. at 1939–40; *Burr v. Sobol,* 748 F.Supp. 97, 101 (S.D.N.Y. 1990).

▆ As for the appropriate hourly rates, the court should look to the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984); *Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d at 1058–59. In meeting this requirement, plaintiff bears the burden of proof, but the court may also take judicial notice of prevailing rates in the community. *See, e.g., id.* at 1059; *Miele v. New York State Teamsters Conf. Pension & Retirement Fund,* 831 F.2d at 409. *Accord, Blum v. Stenson,* 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11.

▆ In making its findings with respect to the proper hourly rate, the court should look to fees charged by attorneys comparably situated to those representing the movant. Thus, if the movant is represented by a small or medium-size firm, the appropriate rates are those typically charged by such firms, whereas a movant may obtain higher compensable rates if represented by a large urban firm, since such firms typically charge more per hour to cover a higher overhead. *See, e.g., Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d at 1058–59; *Jennette v. City of New York,* 800 F.Supp. 1165, 1169 (S.D.N.Y.1992); *Williams v. City of New York,* 728 F.Supp. 1067, 1071 (S.D.N.Y.1990).

▆ We turn first to an assessment of the time claimed by plaintiffs as reimbursable. Defendants are correct in invoking the general proposition that a party should not be awarded compensation for time spent only on claims that were ultimately rejected. If, however, as is often the case, an attorney's labors on a given task are in aid of all his client's claims or at least one on which he prevailed, then compensation is appropriate. *See, e.g., Hensley v. Eckerhart,* 461 U.S. at 435, 103 S.Ct. at 1940; *Grant v. Martinez,* 973 F.2d 96, 101 (2d Cir.1992); *United States Football League v. National Football League,* 887 F.2d 408, 414 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990).

In this case all of plaintiffs' claims were related in that they arose principally or exclusively from defendants' denial of plaintiffs' request for benefits. The only claim with an arguably distinguishable factual base was the claim for non-disclosure of plan documents in the wake of plaintiffs' termination and coincident with their request for benefits, but that claim apparently required little, if any, independent discovery. Not surprisingly, then, defendants identify no time entries relating to discovery that addressed only claims that ultimately were dismissed.

▆ The only basis on which some of the claimed time can be allocated to losing claims involves an examination of entries concerning legal research and briefing of motions addressed to those claims, as well as other related entries that are exclusively related to such claims. In their reply papers, plaintiffs undertake that exercise, and represent that such tasks involved a total of approximately 160 hours of attorney time, or a fee of about $23,600. (*See* Lankenau Reply Aff. at ¶ 16 & n. * & Exh. A). Having acquired considerable familiarity with this case and with the extent of work reasonably required to present and defend the plaintiffs' various claims, I find plaintiffs' estimates to be quite plausible.

There are several additional categories of work that defendants contend should be excluded from our calculations. These include the time devoted to an abortive effort to settle the case, the time spent reviewing depositions conducted in a related litigation initiated by the Equal Employment Opportunity Commission and the time spent in pre-

paring a proposed stipulation of facts that was ultimately never executed.

■ In regard to the settlement efforts, plaintiffs make the reasonable observation that an award of fees would serve the well-recognized policy of encouraging settlement of lawsuits. Indeed, we may fairly assume that the time spent on failed settlement negotiations will be compensable in most cases. This conclusion, however, does not directly answer the question of whether, in this case, the time spent by plaintiffs' counsel on settlement discussions should be rewarded. The problem is not that the discussions failed, but that they apparently foundered principally upon a provision that had been in the agreed-upon working draft settlement for months before one plaintiff rejected it, thus precluding agreement. It is not clear whether this reflected a change of mind by that plaintiff or whether plaintiffs' counsel simply failed to consult with him sufficiently early in the process, but in either event both sides devoted substantial time and efforts to finishing a fairly extensive and detailed agreement, only to discover that plaintiffs would not unanimously endorse it.

Plaintiffs offer no persuasive reason why this fatal problem could not have been discovered by plaintiffs' counsel early in the process, particularly since the basic terms were agreed to several months before the agreement collapsed, and it would be inequitable to impose the burden of that error on defendants.[12] Thus the time spent on settlement from May 1992, when the escrow provision appears to have been embodied in the working draft (see Lankenau Reply Aff. at Exh. B), until November 1992 are not reimbursable. A review of plaintiffs' time sheets reflects that slightly more than 100 hours of attorney time at an average hourly rate of about $250.00 should be excluded on this basis. Hence the fee claim will be reduced by an additional $25,000.00.

■ The other challenged categories of time are properly compensable. The *EEOC* case involved the same layoffs that triggered the ERISA lawsuit, and the transcripts from

that case were obviously a potential source of admissions by defendants. Moreover, since a number of the plaintiffs in this case had been deposed in the *EEOC* suit, it was crucial for counsel to review their prior testimony to anticipate likely cross-examination. Although only one of defendants' witnesses was cross-examined at trial on the basis of his prior testimony in the *EEOC* case, this does not undercut the evident necessity of a full review of the transcripts. Plaintiffs' counsel would have been derelict in their performance if they had not done so, and the time spent on that task is therefore compensable.

■ Equally compensable is the time that counsel spent in preparing proposed stipulations of fact, even though the parties ultimately did not agree on a set of stipulated facts. This point is analogous to our observation that abortive settlement discussions are ordinarily compensable if carried on reasonably and in apparent good faith. The parties are obliged by the rules of the court to attempt to stipulate to as large a body of facts as possible, in the interest of narrowing the trial and minimizing all participants' burden. The record indicates that plaintiffs' counsel prepared a proposed set of stipulations, but the parties were simply unable to reach agreement on them. This does not bespeak either bad faith or unreasonably expended efforts on the part of plaintiffs' counsel, and therefore the time spent on that task is reimbursable.

The foregoing adjustments reduce the total fee for attorneys, paralegals and summer associate to $543,692.00. I have also reviewed the time records and submitted affidavits with a view to whether the amounts of time claimed for the remaining tasks seem excessive, as a result of either overstaffing or other inefficiencies. In conducting that review I have borne in mind the representations of plaintiffs' counsel that he has already excluded an additional $19,454.50 in otherwise billable time because it involved work not deemed reasonably billable. (*See* Lankenau Aff. at ¶ 12). As a further guide I have

---

12. This conclusion does not subvert the policy of encouraging settlement efforts. All that we conclude is that such efforts, like all other litigative work, should be conducted in an orderly and efficient fashion so that the time of the attorneys and the court is not spent unnecessarily.

examined the time records submitted by defendants, which reflect their work on most tasks in the case, but exclude the trial and pretrial preparation. (*See* Affidavit of Christine H. Purdue, Esq., sworn to Aug. 30, 1994, at ¶ 10 & Exh. 34).

Based on my review I conclude that the balance of the time claimed by plaintiffs was reasonably expended. Although the total work time is quite substantial—in excess of 2,200 hours—it must be emphasized that this lawsuit involved twenty-three plaintiffs; several versions of the original complaint; a large and fairly complex body of relevant facts; extensive discovery efforts by both sides, including multiple rounds of document production, interrogatory answers and responses to requests to admit, and nearly thirty depositions taken in this case and others received from related cases; a motion to dismiss; a very extensive set of cross-motions for summary judgment; motion practice regarding plaintiffs' entitlement to a jury trial; preparation of pre-trial submissions and a seven-day jury trial; and finally an extensive set of post-trial motions by both sides. In sum, even with the benefit of hindsight I cannot find that the balance of the time spent by plaintiffs' attorneys warrants reduction for excessiveness.

Defendants offer three remaining challenges to the amount of fees sought. First, they assert that since the fees in question significantly exceed the amount of the benefits to be awarded, the fee total is *per se* unreasonable and should be reduced. Second, they claim that they are entitled to an offset for the fees that they incurred in most of the pre-trial tasks in which they engaged. Third, they take issue with plaintiffs' reliance on their attorneys' current hourly rates for all work done on this case. None of these arguments warrants extended discussion.

▆▆▆ The fact that the fees in this case will exceed the principal amount of the benefit award to plaintiffs is of no moment. The courts routinely uphold fees substantially in excess of the damages awarded to the prevailing party. *See, e.g., Grant v. Martinez,* 973 F.2d at 101 (upholding fee award of $500,000 based on settlement of $60,000); *United States Football League v. National*

*Football League,* 887 F.2d 408, 413–15 (2d Cir.1989) (affirming antitrust fee award exceeding $5.5 million following treble-damage judgment of $3.00). *See also Cruz v. Local Union N. 3 of IBEW,* 34 F.3d 1148, 1158–59; *Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d at 1055, 1057–60 (affirming award of fee exceeding $415,000.00 following grant of monthly pension payment of $2,689.02).

It is true that under 42 U.S.C. § 1988 a plaintiff who obtains only an award of nominal damages, although deemed the prevailing party for the purpose of fee eligibility, will usually receive no fee award, *see Farrar v. Hobby,* —— U.S. at ——, 113 S.Ct. at 575, but that is scarcely the case here. Plaintiffs have fully prevailed on their claim for benefits and will therefore be awarded nearly $400,000.00 in principal. Moreover, for reasons to be noted, plaintiffs will also receive an award of prejudgment interest that substantially increases the amount of the judgment in their favor. In short, there is no basis to reduce the fee award in view of the relief that defendants have obtained in this case.

▆▆▆ Defendants' second argument, for a set-off of fees, is entirely meritless. This argument rests on a misreading of the one case cited by defendants. In *Leigh v. Engle,* 858 F.2d 361 (7th Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989), the court affirmed an order directing that an ERISA trust reimburse the defendant trustees for their legal expenses in successfully defending against certain breach-of-fiduciary-duty claims. That decision was based on the court's reading of the trust instrument, which apparently required such relief for the trustees. *Id.* at 368–69. Thus, the court did not award fees against the plaintiffs, but simply authorized reimbursement from the trust pursuant to specific trust provisions.

Defendants do not seek such relief here. Rather, they demand an award of fees for work done in this case even though they were not the prevailing parties in any meaningful sense and even though they can point to no authority, contractual or legal, for such

an award. As the court observed in *Leigh,* "an award of fees to a losing defendant certainly would contravene Congress' intent, *see* 29 U.S.C. § 1110(a)...." 858 F.2d at 369. Thus, defendants' argument for a set-off of fees must be rejected.

■ Defendants' third argument is similarly baseless. Plaintiffs' counsel have been working on this matter since 1988 and have thus had to wait six years for compensation for a very substantial amount of time that they have expended. In such circumstances the "district courts retain latitude in determining how they will compensate prevailing attorneys for delay," *Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d at 1060, but one approach explicitly endorsed by the Supreme Court is the use of current fee rates. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 282–84, 109 S.Ct. 2463, 2468–69, 105 L.Ed.2d 229 (1989). Whether this approach is appropriate in a given case will depend upon whether the increase in fee rates during the pendency of the lawsuit significantly outstripped interest rates, in which case the use of current rates would improperly award the prevailing party a windfall. *See Huntington Branch, N.A.A.C.P. v. Huntington, N.Y.,* 961 F.2d 1048, 1049 (2d Cir.1992).

In this case plaintiffs offer us a comparison between their fee demand calculated on the basis of historical rates adjusted by the consumer price index and the same demand measured simply by current rates. (*See* Lankenau Reply Aff. at ¶¶ 25–28). Since the difference in results is very small—representing a variance of slightly more than one percent—and since even that difference is probably offset by the fact that the inflation adjustment was done only as of the end of each year, it is obvious that this approach will not yield a windfall for plaintiffs.

Defendants do not otherwise contest the reasonableness of plaintiffs' counsel's hourly rates. Moreover, based on my knowledge of rates customarily charged in this community for equivalent work by law firms of comparable size and sophistication as Lankenau, Kovner & Kurtz, I find the hourly rates charged by counsel to be reasonable. *See, e.g., Beberaggi v. New York City Transit Auth.,* 1994 WL 48805, at * 4 (S.D.N.Y. Feb. 17, 1994); *Pierce v. F.R. Tripler & Co.,* 770 F.Supp. 118, 119–20 (S.D.N.Y.1991), *aff'd in relevant part,* 955 F.2d 820 (2d Cir.1992).

Based on the foregoing analysis, plaintiffs' request for $592,292.00 in fees is reduced by $23,600.00 to account for work on failed claims and by an additional $25,000.00 to account for a portion of the time spent on settlement discussions. In all other respects the fee application is granted. Accordingly, plaintiffs are awarded a total of $543,692.00 in fees.

Plaintiffs also seek an expense award of $53,730.37, for which they offer a breakdown by types of expenses. (*See* Lankenau Aff. at ¶¶ 100–03; Lankenau Reply Aff. at ¶ 30 & Exh. S). Since plaintiffs have been found eligible for a fee award, they are also eligible for reimbursement of their reasonable out-of-pocket expenses associated with this lawsuit,[13] and defendants do not explicitly contest their request. Since I find the amounts incurred to be reasonable under the circumstances, that application is granted as well.

## B. *Pre–Judgment Interest*

■ The remaining issue concerns plaintiffs' application for an award of prejudgment interest. Although not referred to by ERISA, the court has discretion to make such an award in this case. *See e.g., Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83

---

**13.** Section 502(g)(1) of ERISA refers to an award of "costs", but that term apparently covers not only taxable costs under 28 U.S.C. § 1920, but also other disbursements that are customarily charged to the client. *See Scalamandre v. Oxford Health Plans (N.Y.) Inc.,* 823 F.Supp. 1050, 1065 (E.D.N.Y.1993) (holding that plaintiff was entitled to costs, disbursements and attorney's fees and directing plaintiff to submit attorney's time and expense records); *Lutheran Medical Center v.*

*Contractors, Laborers, Teamsters & Engineers Health and Welfare Plan,* 814 F.Supp. 799, 804 (D.Neb.1993), *aff'd,* 25 F.3d 616 (8th Cir.1994) (noting that "out-of-pocket" expenses are proper components of any attorney fee award in an ERISA case). *See also Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 283 (2d Cir.1987) (holding that, in a civil rights suit, awards of attorney's fees include reasonable out-of-pocket expenses).

L.Ed.2d 506 (1984). *See generally Wickham Contracting Co. v. Local Union No. 3, IBEW,* 955 F.2d 831, 833–35 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). In view of the long delay in plaintiffs' receipt of benefits that have now been determined to have been due in 1988, such an award is particularly appropriate as a means of ensuring that plaintiffs are made whole and that defendants do not profit by their failure to comply with their ERISA obligations. These concerns are, by themselves, sufficient to justify the award. *See, e.g., Quesinberry v. Life Ins. Co. of North America,* 987 F.2d 1017, 1030–31 (4th Cir.1993); *Cefali v. Buffalo Brass Co.,* 748 F.Supp. 1011, 1024 (W.D.N.Y.1990).

■ As for the calculation of the award, the interest should commence to run when the claim arose. In this case the claim accrued when plaintiffs were terminated. *See, e.g., Ginett v. Computer Task Group, Inc.,* 962 F.2d 1085, 1101 (2d Cir.1992). Since plaintiffs were paid salary through May 30, 1988, severance was to be paid effective the following day. Accordingly, interest should be calculated on that basis.

■ The parties differ as to the appropriate rate of interest, since there is no explicitly applicable statutory provision. Plaintiffs argue for the nine-percent rate embodied in N.Y.Civ.Prac.Law & R. § 5004, principally because an obligation to pay benefits under a plan is in the nature of a contractual claim. Defendants urge a lower rate, citing the post-judgment interest provision of 28 U.S.C. § 1961.

■ Federal courts that have imposed interest in ERISA cases have disagreed as to whether state or federal law should apply. *Compare, e.g., Quesinberry v. Life Ins. Co. of North America,* 978 F.2d at 1031 (applying state law); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 984 (5th Cir.1991) (same), *with Connecticut General Life Ins. Co. v. Cole,* 821 F.Supp. 193, 203 (S.D.N.Y.1993) (applying section 1961); *Cefali v. Buffalo Brass Co.,* 748 F.Supp. at 1025–26 (same); *McLaughlin v. Cohen,* 686 F.Supp. 454, 458 (S.D.N.Y.1988) (same). We may fairly infer that the court has some discretion in this matter, guided by the understanding that the aim of the relief awarded is to make the plaintiffs whole, but not to give them a windfall. *See generally Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 514 (2d Cir.1994) (quoting *Wickham Contracting Co. v. Local Union No. 3, IBEW,* 955 F.2d at 834). Judged by these concerns, the federal rate is more appropriately used here since it provides a closer approximation of the likely return on plaintiffs' unpaid benefits since 1988. Since interest rates in that period were generally below nine percent, an award under the CPLR provision would overcompensate plaintiffs, a result that we are instructed to avoid.

In view of the foregoing, plaintiffs will be awarded prejudgment interest on their award of severance benefits. The interest is to be calculated pursuant to 28 U.S.C. § 1961, and is to run from May 31, 1988.

### *CONCLUSION*

For the reasons noted, defendants' motion for judgment as a matter of law is denied, as is their alternative motion for a new trial. Plaintiffs' application for an award of attorney's fees is granted, and they are awarded a total of $543,692.00 in fees and $53,730.37 in litigation expenses. Their application for prejudgment interest is also granted, with interest to run from May 31, 1988 at the rates defined by 28 U.S.C. § 1961.

Plaintiffs are to submit a proposed judgment, together with a summary of their calculation of prejudgment interest, within ten days.

**SO ORDERED.**