**BONNIE & COMPANY FASHIONS, INC.**
and Bonnie Boerer, individually,
Plaintiffs,

v.

**BANKERS TRUST COMPANY,**
Defendant.

No. 91 Civ. 0341 (DNE).

United States District Court,
S.D. New York.

July 21, 1997.

**334**

Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C., New York City (Paul A. Marber, Michael M. Rosenbaum, and Richard M. DeAgazio, of counsel), for plaintiffs.

Moses & Singer, L.L.P., New York City (Joel David Sharrow, of counsel), Kravet & Vogel, L.L.P., New York City, (Joseph A. Vogel, of counsel), Bankers Trust Company, New York City, (Jack H. Weiner, of counsel), for defendant.

## OPINION & ORDER

EDELSTEIN, District Judge:

Currently before this Court is a question concerning the release of plaintiff Bonnie Boerer's ("plaintiff" or "Boerer") personal $1,000,000 collateral which presently is held by defendant Bankers Trust Company ("defendant," the "Bank," or "BTC"). For the reasons stated herein, this Court finds that defendant must immediately release Boerer's collateral to her, minus $20,723.87 reimbursement for BTC's expenses of collection, or $979,276.13.

## BACKGROUND

This cases arises from an alleged breach of a factoring agreement (the "Factoring Agreement") between plaintiff Bonnie & Co. Fashions, Inc. ("Bonnie & Co.") and BTC. This Court previously has conducted an exhaustive review of both the factual and procedural history underlying this litigation, *see Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F.Supp. 693, 699–702 (S.D.N.Y.1996) (the "1996 Opinion"); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111 (S.D.N.Y.1997); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 955 F.Supp. 203 (S.D.N.Y.1997) (the "1997 Opinion"); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 171 F.R.D. 79 (S.D.N.Y.1997), and, therefore, this Court will review herein only as much background as is necessary to resolving the instant issues.

Although this case originally consisted of six claims by plaintiffs and eleven counterclaims and affirmative defenses, only one claim is at issue here: Plaintiff's Count Four. In that claim, Boerer seeks the return of a $1,000,000 Treasury Bill which she personally pledged to BTC pursuant to a security agreement (the "Security Agreement"). *See Bonnie & Co.*, 945 F.Supp. at 701–02. In addition, plaintiff sought in Count Four $250,000 in punitive damages for defendant's alleged wrongful withholding of Boerer's collateral. *Id.*

Count Four has been the subject of numerous motions before this Court. First, in 1992 plaintiffs moved for summary judgment on Count Four to compel the immediate return of the Treasury Bill. *Id.* at 714. This Court denied that motion, finding that while defendant "has an undisputed security interest in the collateral ... the amount of collateral necessary to secure defendant's security as this litigation continues is a genuine issue of material fact." *Id.* (citing (Order, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 91 Civ. 0341 (Mar. 6, 1992))).

In 1994, defendants moved for summary judgment on all claims, counterclaims and affirmative defenses. In the 1996 Opinion, this Court denied defendant's motion for summary judgment on Count Four, explaining that "it remains as true now as it did [in 1992]" that an issue of material fact exists concerning the amount of collateral to which each party was entitled, "because plaintiffs claim that they are owed $221,200 by BTC for BTC's alleged breaches of the Factoring Agreement, while BTC claims it is owed $127,608.35 plus interest by plaintiffs for debts arising under the Factoring Agreement." *Id.* (citations omitted). However, this Court granted summary judgment to BTC on plaintiffs' Count Four claim for $250,000 punitive damages. *Id.* In the wake of the 1996 Opinion, therefore, Count Four exists only as a claim for the release of Boerer's $1,000,000 collateral.

Third, in November 1996, plaintiffs again moved for summary judgment on Count Four, as well on defendant's counterclaims which seek attorneys' fees. *See Bonnie & Co.*, 955 F.Supp. at 206. In the 1997 Opinion, this Court determined that plaintiffs had established, and that BTC did not dispute, that Bonnie & Co.'s alleged $127,608 factor account debit to BTC had been ·satisfied through a 1994 bankruptcy settlement. *Id.* at 213. Even though Bonnie & Co. had satisfied its factor account liabilities to BTC, however, this Court found that it was inappropriate to order that BTC release Boerer's $1,000,000 Treasury Bill to her. *Id.* at 215. This Court rejected Boerer's attempt to obtain the immediate release of her collateral because the parties' Factoring Agreement "unambiguously states that the Treasury Bill is collateral for plaintiffs' liability to BTC for Bonnie & Co.'s unpaid factor accounts, as well as for any attorneys' fees and costs for

which plaintiffs are liable." *Id.* This Court further found that plaintiffs' liability to BTC under the Factoring Agreement was limited to BTC's "expenses of collection" of Bonnie & Co.'s unpaid factor account debit of $127,608, and did not include liability for all of BTC's attorneys' fees in this litigation. *Id.* at 218–20.

Finally, in February 1997, plaintiffs again sought the immediate release of Boerer's $1,000,000 Treasury Bill. *See* (Order, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 at 1 ("March 1997 Order") (Mar. 11, 1997).) In light of the 1997 Opinion's finding that BTC's expenses of collection constituted the only liability secured by Boerer's collateral, plaintiffs sought from this Court an Order compelling BTC to provide plaintiffs with a "calculation, along with documentary backup, of the 'expenses of collection' allegedly incurred by defendant in pursuing [Bonnie & Co's alleged $127,608 factor account debit balance]." *Id.* Plaintiffs also sought a hearing to determine the reasonableness of BTC's claimed expenses of collection and the release of the collateral. *Id.* In considering plaintiffs' motion, this Court found that "the only interest defendant has in retaining Boerer's $1,000,000 collateral is to secure defendant's expenses of collection," and "that it is just and proper to finally adjudicate the amount of Boerer's $1,000,000 collateral that defendant may retain as payment for its expenses of collection." *Id.* at 2. Because plaintiffs' liability for BTC's expenses of collection had not yet been determined, this Court again denied plaintiffs' request for the immediate release of Boerer's collateral, as well as their request for a hearing on that issue. *Id.* at 3. This Court also ordered BTC to provide plaintiffs with a calculation, with documentary backup, of BTC's expenses of collection, and set a briefing schedule so that this Court could finally determine how much, if any, of Boerer's $1,000,000 collateral should be returned to her. *Id.*

In accordance with this Court's March 1997 Order, on April 21, 1997, BTC served upon plaintiffs and this Court a "Calculation of Expenses." (*Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("BTC's Calculation of Expenses") (Apr. 21, 1997).) BTC's Calculation of Expenses contains two separate expense calculations. BTC's first calculation, titled "Summary I," totals $433,739.30 and reflects "all of the legal fees and disbursements incurred and paid by the Bank in connection with this matter from August 1990 to May 15, 1995." *Id.* at 1. BTC's "Summary II" amounts to $183,672.00 and reflects "those [expenses] attributable to the prosecution of [BTC's] counterclaims" for Bonnie & Co.'s factor account debit. *Id.* The parties have each fully briefed the issue of how much of Boerer's $1,000,000 collateral BTC may retain in payment for its expenses of collection. See (Defendant's Memorandum Of Law In Support Of Its Calculation Of Expenses, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("BTC Memo") (May 5, 1997)); (Plaintiff's Memorandum Of Law In Opposition To Bankers Trust's Calculation Of Expenses, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("Pltf. Memo") (May 5, 1997)); (Defendant's Memorandum Of Law In Reply to Plaintiffs' Objections To Its Calculation of Expenses, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("BTC Reply Memo") (May 12, 1997)); (Plaintiffs' Reply Memo Of Law In Opposition To Bankers Trust's Calculation of Expenses, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 ("Pltf. Reply Memo") (May 12, 1997)). It is that issue which this Court must resolve in the instant Opinion.

Before determining amount of collection expenses which BTC may withhold from Boerer's collateral, this Court notes that on June 3, 1997, this Court received a copy of a letter from the United States Marshals Service to counsel for BTC. (Letter from Elizabeth Baskerville, Administrative Support Assistant for the United States Marshals Service, to Joseph A. Vogel, Esq. (the "Marshals Letter") (June 3, 1997).) In that letter, the Marshals Service informs BTC that "pursuant to the attached copy of Writ of Execution, [it is] herewith levying on all the right, title interest which the said, Bonnie & Co. Fashion Inc. d/b/a/ Bonnie & Company, judgment debtor, has in any funds, property or assets you may be holding in your possession to the amount of $194,092.60 to sat-

isfy the judgment of $194,048.88, and Marshals fees in the amount of $43.72." *Id.*

Finally, in apparent anticipation of an adverse ruling in the instant Opinion and Order, BTC has requested, pursuant to Federal Rule of Civil Procedure ("Rule") 54(b), an express determination of the finality of this Court's adjudication of Count Four so that BTC may immediately appeal. BTC has further requested a stay of this Court's findings during the pendency that appeal.

### DISCUSSION

This Court must resolve three issues in the instant Opinion & Order. First, this Court must determine the appropriate level of BTC's "expenses of collection," and, once that figure is calculated, order BTC to return Boerer's $1,000,000 collateral less BTC's expenses of collection. Second, this Court must consider the effect upon Boerer's collateral of the Marshals Service's levying upon $194,092.60 of Bonnie & Co.'s assets held by BTC. Third, this Court must address BTC's Rule 54(b) request, as well as its request for a stay pending its appeal. These issues will be discussed individually.

### I. BTC'S APPROPRIATE "EXPENSES OF COLLECTION"

The parties' submissions make clear their disagreement over the appropriate level of BTC's expenses of collection. BTC claims that it is entitled to the expenses calculated in Summary I, $433,739.30, or that, alternatively, it is at least entitled to $183,672.00, as tabulated in Summary II. As might be expected, plaintiffs argue that BTC is not even entitled to the proposed Summary II expenses. Each side offers several arguments in support of its respective position, and this Court will consider the appropriateness of BTC's proposed expense summaries individually

#### A. BTC's Summary I Expense Calculation

In arriving at the $433,739.30 level of fees in Summary I, BTC employed an "intertwined claims" argument. That argument reasons that if BTC, rather than plaintiffs, initiated this lawsuit to recover Bonnie & Co.'s factor account debit balance, "five of plaintiffs' six claims (negligence, breach of fiduciary duty, breach of contract, return of collateral, and damages from negligence and breach) would likely have been asserted by plaintiffs as affirmative defenses." *Id.* at 7. As a result, BTC argues, "time spent on discovery or preparing a motion directed to one or more of [BTC's] claims necessarily entailed addressing some or most of plaintiffs' claims." *Id.* According to BTC, "the intertwined nature of these claims makes it proper for [BTC] to recover its expenses incurred in both prosecuting counterclaims and in defending inter-related affirmative claims, all of which involve a common core of operative facts." *Id.*

Additionally, BTC contends that "[i]t is both unnecessary and inappropriate to attempt to apportion the expenditure [of time] by [BTC's] counsel between the prosecution of [BTC's] counterclaims and defense of the plaintiffs' claims" because most of counsel's time was dedicated to determining "the parties' respective rights and obligations under the Factoring Agreement and the related agreements." *Id.* at 8–9. As a result, BTC claims that it "is entitled to recover all of its fees and disbursements through May 15, 1995[,] in the amount of $433, 739.30." *Id.* at 9.

Plaintiffs oppose BTC's attempt to recover all of its attorneys' fees in this litigation, as calculated in Summary I. *See* (Pltf. Memo at 5.) Specifically, plaintiffs deride BTC's request for $433,739.30 in attorneys' fees for a $127,608 collection claims as "nothing short of outrageous." *Id.* Moreover, plaintiffs point out that "in requesting all of its litigation expenses … BTC makes a mockery of this Court's decisions" which make clear that BTC is entitled only to its "expenses of collection" of Bonnie & Co.'s factor account debit balance, not all of its expenses arising from this lawsuit. *Id.* at 5–7.

Furthermore, responding to BTC's claim that its defense fees are inextricably intertwined with its expenses of collection, plaintiffs assert that BTC is merely attempting to circumvent this Court's rulings. *Id.* at 6. Rather than intertwined, plaintiffs claim that "BTC's collection claim was a separate and

distinct unit of this litigation that contained facts completely independent from those underlying plaintiffs' lender liability claims." *Id.* Plaintiffs reason that, because plaintiffs' claims "arose from the *termination* of the Factoring Agreement during 1989—while BTC's $127,608 claim arose *under* the Factoring Agreement—the success of BTC's collection claim did not depend on BTC defeating plaintiffs' lender liability claims," and thus, "there was nothing 'intertwined' about those claims." *Id.* at 6–7. As a result, plaintiffs contend that Summary I grossly misstates the amount of Boerer's $1,000,000 collateral that BTC may retain, and that "the proper focus of BTC's fee application is on 'Summary II.'" *Id.* at 7.

This Court begins its resolution of the applicability of Summary I by noting that its prior decisions in this case are abundantly clear in the following respect: under the Factoring Agreement, BTC is contractually entitled to no more than its "expenses of collection" of Bonnie & Co.'s factor account debit balance. Neither party expressly disputes this premise. The parties' disagreement over the propriety of Summary I, therefore, arises from their differing interpretations of what constitutes BTC's collection expenses in this litigation.

Nevertheless, the parties's submissions indicate that they appear to agree that BTC's ability to collect its Summary I expenses turns upon this Court's reading of the Second Circuit's decision in *Diamond D Enterprises USA, Inc. v. Steinsvaag*, 979 F.2d 14 (2d Cir.1992), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). There, Diamond D Enterprises USA, Inc. ("Diamond"), a franchisor of wedding-service businesses, entered into a franchise agreement with Wedding Services, Inc. ("WSI"), a corporation owned by Richard Steinsvaag ("Steinsvaag"), who personally guaranteed WSI's obligations. *Id.* at 16. When WSI defaulted on its obligations to Diamond under their franchise agreement, Diamond terminated WSI's franchise and sued WSI and Steinsvaag ("defendants") for, *inter alia*, breach of contract. *Id.* Defendants asserted three affirmative defenses and eight counterclaims against Diamond as well as two addi-

tional defendants. *Id.* As the Second Circuit noted, "[a]lthough the counterclaims alleged various contract, tort, and statutory claims, they shared a common nucleus: that Diamond fraudulently induced WSI to execute the franchise agreement by misrepresenting the prospects of [Diamond's] franchises." *Id.* After the district court dismissed two of defendants' counterclaims, a jury trial was held and a verdict was returned awarding Diamond D $1,300 on its contract claim and rejecting defendants' remaining counterclaims. *Id.* at 17.

Diamond successfully moved for a new trial on the issue of damages, and moved for an interim award of attorneys' fees under a fee-shifting clause in the franchise agreement. *Id.* The district court awarded interim attorneys' fees in the amount of $34,288. *Id.* The jury in the second trial awarded damages of $17,109, to which the trial judge added $6,990 for attorneys' fees incurred since the first award. *Id.* On appeal, defendants argued that the award of attorneys' fees were unauthorized by the franchise agreement and were excessive. *Id.*

The franchise agreement's fee-shifting provision under which Diamond was awarded fees was, according to the Second Circuit, an "ambling one-sentence clause" that was "hardly a paragon of clarity." *Id.* at 18. Steinsvaag argued that the clause's text provided for reimbursement only of those attorneys' fees which Diamond "incurred in enforcing" the franchise agreement, and excluded reimbursement for costs Diamond incurred defending defendants' counterclaims. *Id.* The Second Circuit, however, reasoned that

> the nature—not the nomenclature—of a claim is controlling. Thus, 'where a fee applicant recovers on a claim subject to a contractual attorneys' fee provision and in the process litigates a *counterclaim* on which he must prevail in order to recover on his claim, the fee applicant is entitled to his attorneys' fees for both the claim and the counterclaim.'

*Id.* (emphasis added) (quoting *Singer v. Shannon & Luchs Co.*, 670 F.Supp. 1024, 1028 (D.D.C.1987)). Based on this reasoning, the *Diamond D* court found that Diamond D

should be reimbursed for its defense of the counterclaims which alleged breaches of express or implied terms of the franchise agreement because "they arose out of the contract and threatened its effective enforcement." *Id.* In addition, the court determined that Diamond D's costs of defending defendants' counterclaims alleging fraudulent inducement to contract were reimbursable because, if successful, those counterclaims would "operate to vitiate the contract." *Id.* at 18–19.

■ In the instant case, the parties' stances are opposite those of *Diamond D.* Instead of the plaintiff seeking to recover fees expended defending counterclaims, here it is the defendant, BTC, seeking reimbursement for costs incurred defending plaintiffs' claims. Nevertheless, the same principal controls: Where a fee applicant recovers on a claim subject to a contractual attorneys' fee provision and in the process litigates a counterclaim on which he *must* prevail in order to recover on his claim, the applicant is entitled to his attorneys' fees for both the claim and the counterclaim. *Id.* at 18.

Applying *Diamond D* to the case at bar, it is clear that, in addition to its "expenses of collection," BTC is entitled to recover only those attorneys fees which it expended defending plaintiffs' claims on which it "must prevail" in order to enforce the Factoring Agreement and to collect Bonnie & Co.'s factor account debit balance. In *Diamond D*, however, all of defendants' counterclaims, if successful, would have invalidated the subject franchise agreement, thereby rendering it unenforceable. *Id.* at 16 (all of the *Diamond D* defendants' counterclaims "shared a common nucleus: that Diamond fraudulently induced WSI to execute the franchise agreement …"). Conversely, plaintiffs in the instant case advance no claim charging that the Factoring Agreement is invalid.

Instead, plaintiffs' First, Second, Third, and Fifth Counts all allege, *inter alia,* violations of the Factoring Agreement by BTC. *See Bonnie & Co.,* 945 F.Supp. at 702–03. Plaintiffs' Count Four—the subject of the instant opinion—seeks the release of Boerer's $1,000,000 Treasury Bill which was pledged pursuant to a separate agreement, and plainly does not contest the validity of the Factoring Agreement. See *id.* at 703. Finally, in Count Six plaintiffs seek to recover costs incurred as a result of BTC's alleged breaches of the Factoring Agreement. *See id.* None of these counts, therefore, threatens BTC's ability to enforce the Factoring Agreement to collect Bonnie & Co.'s factor account debit balance. Accordingly, this Court finds that BTC is not entitled to recover all of its attorneys' fees in this litigation, and that therefore its Summary I is an inaccurate figure upon which to base an award of fees.

### B. BTC's Summary II Expense Calculation

Having concluded that BTC's Summary I vastly exaggerates the amount of fees it is entitled to retain, this Court must now consider the merits of BTC's Summary II. Summary II states BTC's alternative request for $183,672 in expenses, which BTC claims are attributable to its prosecution of its First and Third Counterclaims seeking recovery of Bonnie & Co.'s $127,608 factor account debit balance. See (BTC's Calculation of Expenses at 1, 3.) Summary II is divided into two schedules. (Bernstein Aff. ¶ 22.) Schedule A is consists of "entries which clearly reflect legal work performed *only* in connection with [BTC's] direct efforts to pursue [Bonnie & Co.'s] debit balance." *Id.* (emphasis added). Schedule B includes "time entries which are *partially* attributable to [BTC's] pursuit of [Bonnie & Co.'s] debit balance." (BTC's Calculation of Expenses at 3 (emphasis added).) Because the Schedule B entries are only partially attributable to BTC's collection efforts, BTC seeks only 40% of those costs, reasoning that "[g]iven the intertwined nature of the claims and counterclaims … [BTC] respectfully submits that 40% is a fair and reasonable allocation—and decidedly advantageous to plaintiffs." (BTC Memo at 9.)

Plaintiffs dispute the accuracy of Summary II. First, plaintiffs argue that, under New York law, creditors are only entitled to a collection fee of between one-tenth and one-third of the amount of the unpaid debt. (Pltf. Memo at 16.) Because the unpaid debt

in this case amounts to $127,608, plaintiffs contend that BTC's Summary II figure of $183,672 is wildly inappropriate. *Id.* at 17–18. Second, plaintiffs contend that Summary II is "defective" because many of its entries "contain vague and generalized descriptions, making it impossible to determine whether the work performed was collection-related." *Id.* at 18. As a result, plaintiffs urge this Court not to award the full amount requested in Summary II. *Id.* at 19. Plaintiffs further point out that "[t]he rule requiring detailed descriptions of the legal work has even greater relevance here, because BTC is only entitled to expenses of collection and is *not* entitled to fees relating to any other claims in this case." *Id.* at 20 (emphasis in original).

Third, plaintiffs dissect BTC's Schedule A, which BTC claims contains expenses "wholly attributable to the pursuit of the debit balance," and asserts that much of it is, in fact, attributable to other facets of this litigation and not recoverable. *Id.* at 21. Plaintiffs contend that BTC is entitled to only $3,538.75 for the work properly included in Schedule A. *Id.* at 22 n. 5.

Fourth, plaintiffs challenge BTC's claim that it is entitled to 40% of the fees in Schedule B. *Id.* at 22. Again, plaintiffs contend that "many of the [Schedule B] entries lack detailed descriptions of the work performed." *Id.* at 23. Moreover, plaintiffs contend that, "of the entries that contain some description, there is no breakdown between collection and non-collection work." *Id.* Finally, plaintiffs attack BTC's use of "40%" in rendering its Schedule B calculations because "BTC's collection claim did not even approach 40 percent of the time spent on this matter." *Id.* Fifth, plaintiffs contend that BTC's application for costs and disbursements "should be drastically reduced because BTC has made no attempt whatsoever to delineate which of its claimed $54,455 in costs related to collection." *Id.* at 25.

Fifth, plaintiffs argue that "some of the legal work performed by BTC's legion of attorneys was duplicative and unreasonable." *Id.* at 26. Plaintiffs also charge that Kerwyn Welch ("Welch"), a paralegal on BTC's legal team submitted "bloated billings" for which plaintiffs should not be liable. *Id.* at 26–27.

Finally, plaintiffs claim that disbursements such as "secretarial overtime, word processing, carfare, computer research, meals, velobinding, outside taxi, exhibit tabs, and local transportation" are "part of law firm overhead," and therefore not reimbursable by plaintiffs as expenses of collection. *Id.* at 27.

In response to plaintiffs' attacks on Summary II, BTC claims that its expenses are "customary and reasonable." (BTC Reply Memo at 5.) BTC first questions plaintiffs' assertion that BTC's expense recovery is limited to between one-tenth and one-third of Bonnie & Co.'s $127,608 indebtedness. *Id.* BTC contends that plaintiffs' position is based on a misreading of the case law, and that the cases employing such a limit involve "either contingency fees agreements, fixed percentage fee provisions or fees limited pursuant to federal statute, each of which [is] distinctly different from the case at bar." *Id.*

Second, BTC counters plaintiffs' claim that the descriptions of the legal work in BTC's attorneys' bills are inadequate. *Id.* at 7. BTC states that "[w]hile certain entries obviously were not as descriptive as others, the Court should look to counsel's affidavits for further support, explanation and detail of the underlying time records." *Id.*

Third, BTC asserts that "plaintiffs' objections to [BTC's] [40%] apportionment are insufficient." *Id.* at 10. Specifically, BTC argues that "plaintiffs improperly seek to use a few, nondescriptive [time entries] as a basis to object to virtually all of [BTC's] time." *Id.* As an example of "the only instance in which plaintiffs have given any real detail" BTC points to plaintiffs' objection to the billings of Welch, BTC's paralegal. *Id.* BTC maintains that Welch's billable time was proper, and that plaintiffs object to all of Welch's billable time even though only part of it was included in Summary II. *Id.* at 10–11 n. 4.

Finally, BTC contends that it properly included its costs and disbursements in Summary II. *Id.* at 12. BTC asserts that plaintiffs rely on "outdated case law" to argue that "disbursements for costs such as secretarial overtime, word processing, car fare,

computer research, and transportation are 'not compensable' because the comprise part of a law firm's 'overhead.'" *Id.* More recent case law, BTC argues, "award[s] such costs so long as the firm regularly charges its clients for those items," and that "all of the disbursements sought by [BTC] are … regularly charged to and paid by [BTC's] counsel's regular clients." *Id.*

■ In the Second Circuit, legal fee applicants are to utilize the "lodestar approach" to calculate their fees by multiplying the number of attorney and legal staff hours reasonably expended upon a matter by a reasonable hourly rates. *See Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.1992), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993); *Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 875, 894 (S.D.N.Y. 1994). Plaintiffs do not dispute the hourly rates of BTC's attorneys. *See generally* (Pltf.Memo); (Pltf. Reply Memo). Accordingly, the only issue presently to be resolved is the number of attorney and legal staff hours for which BTC can be compensated in its attempt to collect Bonnie & Co.'s indebtedness.

■ On a fee application, the applicant has the burden of documenting and proving its fee claims. *Ragin v. Harry Macklowe Real Estate Co.,* 870 F.Supp. 510, 515 (S.D.N.Y.1994). To determine the number of hours which are properly compensable, a court must initially look to the amount of time spent on each category of tasks, as documented by contemporaneous time records of the requesting party's attorneys. *See Algie,* 891 F.Supp. at 894; *T.E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 528 (2d Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990); *Miele v. New York State Teamsters Conf. Pension & Retirement Fund,* 831 F.2d 407, 408 (2d Cir.1987). The court must then judge how much of that time was *reasonably* spent by reference to the court's own experience with the case, its own experience with litigation generally, as well as to the submissions and arguments by the parties. *See Algie,* 891 F.Supp. at 894; *Clarke v. Frank,* 960 F.2d 1146, 1153 (2d Cir.1992); *DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985). If the court concludes that portions of the expended time were not reasonably necessary to achieve the results obtained by the applying party, the court should reduce the time for which compensation is awarded. *See Hensley v. Eckerhart,* 461 U.S. 424, 434–35, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

■ Reductions in the amount of time for which a party seeks compensation are proper in order to account for work on claims unrelated to those for which the party is entitled to legal fees. *See Algie,* 891 F.Supp. at 894–95; *Chambless v. Masters, Mates & Pilots Pension Plan,* 697 F.Supp. 642, 648 (S.D.N.Y.1988), *aff'd in relevant part,* 885 F.2d 1053 (2d Cir.1989), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990). Reductions are also appropriate where a court finds that the legal expenses sought to be reimbursed were incurred through inefficient or duplicative work. *See City of Riverside v. Rivera,* 477 U.S. 561, 578 n. 9, 106 S.Ct. 2686, 2696 n. 9, 91 L.Ed.2d 466 (1986).

■ In addition, a fee application must be supported by "contemporaneous time record which describe with specificity the work done." *Ragin,* 870 F.Supp. at 520 (citing *New York State Assoc. for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147–48 (2d Cir.1983) (making mandatory the Second Circuit's previous preference for contemporaneous time records)); *see also Mar Oil, S.A. v. Morrissey,* 982 F.2d 830, 840 (2d Cir.1993) (vacating district court's unquestioning acceptance of a lawyer's hours unsupported by contemporaneous records). Accordingly,

> the burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested.

*Id.* (citing *F.H. Krear,* 810 F.2d at 1265) (rejecting time records with two- and three-word descriptions for an entire day's work, such as "reviewed docs." and "clients re: testimony"). When the Second Circuit's contemporaneous time record requirement is not

satisfied, district courts "have seen fit to adopt a roughly 30% fee reduction rule for an attorney's failure to keep contemporaneous time records of [his] services." *Id.* at 521 (listing cases).

 Counsel is not, however, "required to record in great detail how each minute of his time was expended, but at least counsel should identify the general subject matter of his time expenditures." *Id.* (quoting *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12). In fact, where an attorney's time entries are vague, courts may attempt to decipher them by reference to "the context in which these entries occur [to determine] what work was involved." *Lenihan v. City of New York,* 640 F.Supp. 822, 826 (S.D.N.Y. 1986) (where "a seven hour entry for 'general preparation' [wa]s followed immediately by an entry the next day for a preliminary injunction hearing," the court found the former entry not vague); *see also Meriwether v. Coughlin,* 727 F.Supp. 823, 827 (S.D.N.Y. 1989).

Turning to the case at bar, this Court has reviewed each time entry which BTC submits as documentation of its Calculation of Expenses. Because BTC submits billing records from its two law firms, this Court will address each firm separately.

### 1. Moses & Singer

First, with respect to Moses & Singer, BTC's primary counsel, this Court is both shocked and dismayed by its shoddy record-keeping. The overwhelming majority of that firm's entries utterly fail to shed light on the manner in which the firm's lawyers and staff spent their time in this matter, and what services they rendered to BTC. To take just one of an extraordinary number of examples, Mitchell D. Bernstein ("Bernstein"), a Senior Associate at Moses & Singer, L.L.P., documented the 32.6 hours he spent on this litigation in June 1993 in the following manner: "O/C JDS; review docs. & memo" (1.6 hours); "O/C JDS; review docs." (.8 hours); "O/C JDS; review docs." (1.6 hours); "Organize and review Bonnie files" (2.5 hours); "O/C JDS" (.4 hours); "Review file docs." (3 hours); "O/C/ JDS; review docs." (1.7 hours); "Review docs." (1 hour); "Review documents" (2.3 hours); "Digest discovery docs." (1.8 hours); "Review docs." (2.1 hours); "Review docs.; digest discovery and transcripts" (2 hours); "Review docs." (2.6 hours); "Digest dep. transcript" (3.8 hours); "Review deposition transcripts, docs." (3.1 hours); and "Digest deposition transcript" (2.3 hours). (BTC Calculation of Expenses at Exh. A.) Unfortunately, this sort of record-keeping is not isolated to Bernstein. Joel David Sharrow ("Sharrow"), BTC's lead counsel in this case, describes his time in numerous entries as "CW MDB." *See id.* This Court is at a complete loss as to what these five letters might signify, and how they might relate to BTC's expenses of collection in this matter. Moreover, this Court is bewildered that a firm which has long argued that all of its fees' are reimbursable under the Factoring Agreement would keep such poor records of its billable time. If it had truly expected this Court to award it fees, and was aware of the substantial amount of clear, binding case law making vague time entries noncompensable, Moses & Singer should have done a far better job of keeping track of its time.

 As is plain from the above examples, Moses & Singer's billing records do not comply with the Second Circuit's mandatory requirement that a fee applicant submit detailed contemporaneous records to document its claimed fees. *See New York State Assoc. for Retarded Children,* 711 F.2d at 1147–48. Where, as here, "adequate contemporaneous records have not been kept [by the fee applicant], the court should not award the full amount requested." *Ragin,* 870 F.Supp. at 520 (citation omitted) Moreover, in light of the clear standard that lawyers must keep *contemporaneous* records of their time in order to successfully obtain reimbursement under a contractual fee-shifting provision, this Court finds that the affidavits submitted by Moses & Singer purporting to substantiate their bills to be irrelevant.

Nevertheless, this Court must now determine how much of BTC's claimed Summary II fees BTC should be awarded. As noted above, numerous courts within this Circuit, including the Second Circuit itself, have found it appropriate in these circumstances

simply to reduce the fee application by 30%. *See Ragin,* 870 F.Supp. at 521 (listing cases). An inspection of Moses & Singer's billing records in this case, however, reveals that even a 30% reduction in the claimed time may be too generous in light of the vagueness of their records. Therefore, instead of making an across-the-board 30% reduction of Moses & Singer's time in the Summary II expense calculation, this Court will review each of that firm's time entries in Summary II to determine whether it is traceable to BTC's collection efforts, and thus compensable. In so doing, this Court will examine vague entries in light of the context in which they appear. *See Lenihan,* 640 F.Supp. at 826. Before doing so, this Court again notes that BTC divided Summary II into Schedule A, which purportedly reflects legal fees expended directly on its collection efforts, and Schedule B, which includes fees 40% of which are attributable to collection expenses. In making its own determination, this Court finds the distinctions made in these schedules self-serving, meritless, and not at all helpful to determining the appropriate level of fees to be awarded. Accordingly, this Court will award fees only where Moses & Singer's billing records clearly state that time was spent in pursuit on Bonnie & Co.'s factor account debit balance without regard to BTC's proffered schedules.

Although Moses & Singer's billing records begin in May 1993, this Court's inspection of those records reveals that no bills attributable to BTC's collection efforts until December 1993. At that time, Moses & Singer's records indicate that Bernstein spent time reviewing documents pertaining to BTC's "chargebacks" against Bonnie & Co.'s factor account. (BTC's Calculation of Expenses at App. A.) The chargebacks plainly affected the level of Bonnie & Co.'s indebtedness to BTC and, as a result, the time spent on this issue is compensable as an expense of collection of the Bonnie & Co. debt. The billing records reflect that Bernstein spent 7.3 hours over fours days on this issue, *see id.,* and BTC may be compensated for that time. Likewise, in January 1994, Bernstein spent 1.8 hours on the chargeback issue, *see id.,* which also is compensable.

In March 1994, Bernstein spent 4.6 hours "[r]eviewing bank docs., Factoring statements; o/c JDS." *Id.* This Court cannot decode what is meant by "o/c JDS," so it will award fees for two-thirds of this time (3.06 hours) for Bernstein's review of the bank documents and factoring statements, both of which relate to the level of Bonnie & Co.'s debt and are therefore traceable to BTC's efforts to collect that debt.

Also in March and April 1994, Bernstein allocated time to the "Prizzi Affid." *See id.* The forty-page affidavit of Salvatore Prizzi ("Prizzi"), a former Vice President of BTC who was involved in the collection of BTC's factor accounts, was submitted to this Court in April 1994 in support of BTC's motion for summary judgment. See (Affidavit of Salvatore Prizzi in Support of Defendant's Motion for Summary Judgment, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 91 Civ. 0341 (Apr. 7, 1994).) That affidavit largely pertained to the chargeback issue. *See id.* ¶¶ 19–22. As a result, the time Bernstein dedicated to preparing and drafting Prizzi's affidavit in March 1994 is attributable to BTC's collection efforts, and thus is compensable. However, Bernstein's billing records combine his work on the Prizzi affidavit with other, noncompensable time. For example, on March 24, 1993, Bernstein billed 6.9 hours of his time as "Mtg. w/vogel & Contrucci; review docs; o/c JDS' review Prizzi Affid.; draft Contrucci Affid." (BTC Calculation of Expenses at App. A.) In this entry, only the fraction of Bernstein's 6.9 hours devoted to his work on the Prizzi affidavit is compensable. In all, Bernstein billed BTC for approximately 40 hours during March and April 1993, parts of which are compensable as work on the Prizzi affidavit. *See id.* Taking a generous view of these billings, this Court will permit BTC to recover for 25 hours of Bernstein's time for this work.

Similarly, the time Moses & Singer spent preparing for and taking the deposition of Nikki Cifarelli ("Cifarelli") is compensable. Cifarelli was Bonnie & Co.'s Corporate Vice President from 1984 through 1990, and was responsible for securing Bonnie & Co.'s credit from BTC during that period. *See Bonnie & Co.,* 945 F.Supp. at 732. In July and

August 1994, Sharrow spent approximately 25 hours and Bernstein spent 3.2 hours preparing for and taking Cifarelli's deposition. *See* (BTC Calculation of Expenses at App. A.) In light of Cifarelli's role in securing the credit from BTC which formed part of Bonnie & Co.'s debt, this time is compensable as costs of collection. Also in August 1994, part of 2.6 hours Bernstein billed to BTC was spent on "T/C Federated, Sastro re: Burdines chargebacks," which, as explained above, is a compensable collection expense. *Id.* There is another entry under that 2.6 hours ("t/c Peduto, Santoro; review and organize deposition exhibits") which is too vague to be compensable. Thus, this Court finds that one-half of the 2.6 hours is a compensable collection expense.

Not until October 1994 does this Court find another compensable collection expense. On October 3, 1994, Bernstein spent approximately one hour "review[ing] factoring docs," and on October 4, 1994, one of four entries under a .6–hour bill to BTC was spent on "t/c Federated." *Id.* As noted above, Federated is the bankrupt entity which ultimately paid to BTC the Bonnie & Co. indebtedness. In addition to the hour Bernstein spent reviewing factoring documents, therefore, this Court finds that one-fourth of the .6 hours is also compensable.

After another period of no compensable collection expenses documented in Moses & Singer' billing records, on January 31, 1995, Sharrow states that he spent .05 hours on "fc Weiner re $ amounts due to BT." *Id.* Similarly, on February 1, 1995, Sharrow bills BTC .35 hours for "cw JHW . . . ce Weiner and revise MDB outline of amounts due." *Id.* "Weiner" is likely Jack H. Weiner, BTC's general counsel, so it is thus surmisable that this time was spent discussing Bonnie & Co.'s factor account debit balance which was "due to BT." As such, this Court finds that these time entries, which combined total .4 hours, are compensable as costs of collection.

In March 1995, Sharrow recorded .95 hours for "fc Jean Shedlock of BNY, she is still not sure whether and/or to what extent BNY rec'd $ from the Federated settlement and does not know of payments by BNY to BT" and "w/ MDB and conf call Jean Shed-lock and Cedric Wms. of BNY re no payments yet to BT and not sure when or how much, chargeback and buyer's hold." *Id.* Because these time entries are exceptional in their detail, and they clearly indicate that Sharrow's time was spent attempting to collect the Bonnie & Co. indebtedness from BNY on behalf of BTC, they are plainly compensable.

Likewise, from May 10 through May 15, 1995, Sharrow spent parts of 3.3 hours billed to BTC seeking to ascertain when BNY would pay BTC the Bonnie & Co. indebtedness. *Id.* These 3.3 hours were also comprised of time Sharrow spent on a substitution of counsel issue, apparently relating to Vogel, one of BTC's other lawyers. *Id.* That time is not a compensable collection expense. Consequently, of these 3.3 hours, this Court will permit BTC to be compensated for 2.0 hours. In early May 1995, Bernstein also spent 3.2 hours on the payment from BNY to BTC to satisfy the Bonnie & Co. indebtedness. *Id.* All of this time is compensable, as it appears that it was devoted solely to this issue, an obvious expense of collection.

Having sifted through Moses & Singer's billing records in this matter, this Court has come up with the following totals: 28.35 compensable hours for Sharrow and 45.01 compensable hours for Bernstein. Sharrow billed at $240 per hour during the relevant period, so BTC may be reimbursed $6,804 for his time. Bernstein billed out at $160 per hour during the relevant period, so BTC may recover $7,201.60 for his time. The total amount which BTC is entitled to recover for Moses & Singer's collection efforts is thus $14,005.60

█ BTC submits that Moses & Singer incurred $47,274.01 in total disbursements in litigating this matter. (BTC Calculation of Expenses at 2.) This Court must now ascertain what, if any, portion of those disbursements is compensable as expenses of collection. Unfortunately, the documentary back-up submitted to establish Moses & Singer's disbursements does not distinguish between those outlays made in pursuit of Bonnie & Co.'s factor account debit balance and those attributable to the rest of this case. As a result, this Court finds that a fair method of

determining Moses & Singer's compensable disbursements is simply to allow BTC to recover the same percentage of Moses & Singer's disbursements as the percentage of Moses & Singer's total time that BTC recovered for Moses & Singer's collection efforts. Moses & Singer claims that the value of its "total time spent" is $269,265.05, while this Court found above that Bonnie & Co. is responsible for just $14,005.60, or 5.2%, of Moses & Singer's time. Accordingly, Bonnie & Co. is liable for 5.2% of Moses & Singer's total disbursements, or $2,458.25. In sum, therefore, this Court finds that BTC may retain $16,463.85 ($14,005.60 plus $2,458.25) of Boerer's $1,000,000 collateral to pay for Moses & Singer's collection efforts.

### 2. Hahn & Hessen

The billing records submitted by Hahn & Hessen, BTC's other law firm involved in this matter during the relevant period, are only slightly more illuminating than those of Moses & Singer. Unfortunately, however, Hahn & Hessen's billing records are still too vague for this Court to award legal expenses without examining each entry. According, as with Moses & Singer's fees above, this Court has sifted through each of Hahn & Hessen's time entries to determine whether it is properly compensable under the Factoring Agreement as an expense of collection.

Hahn & Hessen's billings in this lawsuit commence in August 1990. *Id.* at App. B. In September 1990, the first compensable billable time appears. On September 12, Joseph A. Vogel ("Vogel") bills .75 hours to "discussion with J. Vogel and Tim Strachan regarding background and current status of account." *Id.* This Court takes "account" in this entry to mean Bonnie & Co.'s factor account and so, liberally construed, this entry appears related to BTC's efforts to collect that account debit. As such, it is compensable. On September 13, 1990, Steven J. Mandelsberg ("Mandelsberg") billed .25 hours to BTC for a "[d]iscussion with JAV re: status and outstanding chargeback issues to be addressed at upcoming settlement meeting." *Id.* As work related to the chargeback issue, this time is also compensable.

Likewise, on September 26, 1990, I. Taylor–Kam ("Kam") billed 1.5 hours for "[r]esearch on buyers hold." *Id.* The buyer's hold issue impacts directly upon the level of Bonnie & Co.'s factor account debit balance because it is a component of the chargeback process. Accordingly, Kam's time is compensable as an expense of collection under the Factoring Agreement. For the same reason, the .75 hours which Vogel billed on September 30, 1990, for "[d]raft[ing] letter to J. Weiner re: research on buyers' hold issue; arrang[ing] for delivery monday; review[ing] results/conclusions; [and] check[ing] cites," *id.*, and the .25 hours which Mandelsberg spent on October 1, 1990, "[r]eview[ing] 10/1 [Vogel] letter re: research re: 'buyers hold'; [and] conference re: same with [Vogel]," *id.*, also are compensable.

After reviewing closely BTC's submitted legal bills, this Court did not come across another compensable expense of collection until February 1992. On February 6, 1992, Vogel spent 1.5 hours "[r]eviewing motion for partial summary judgment by Bonnie Fashions. Begin[ning] draft of opposition papers. Telephon[ing] A. Mahoney re: status of settlement talks. Review[ing] correspondence/file re: chargeback dispute." *Id.* Only one-fourth of this 1.5 hour period was devoted to BTC's collection efforts (the chargeback issue), so just .375 hours is compensable. The next day, February 7, 1992, Vogel spent another 1.5 hours on his "[c]ontinuing review of file/correspondence re: buyers hold/chargeback in preparation for opposition to partial summary judgment motion of plaintiff." *Id.* As with all time devoted to the buyers hold and chargeback issues, this time is compensable.

From late 1992 through early 1993, BTC's attorney's worked on the "Allied/Federated claim." *Id.* As noted above, this Bonnie & Co.'s factor account debit balance with BTC was ultimately satisfied through a payment from the Allied/Federated bankruptcy proceedings. As a result, the time which BTC's attorney's spent pursuing such payment constitutes compensable expenses of collection. From September 1992 through march 1993, Vogel spent a total of 8.1 hours on the Allied/Federated claim. *Id.* During that same

period, Mandelsberg and Lawrence G. Novick ("Novick") each spent .5 hours working on this claim. *Id.* Finally, in October 1994, the last compensable time spent by BTC's attorneys. From October 17 through 27, 1994, Vogel spent 1.2 hours on the Allied/Federated payment.

Adding these compensable hours together, this Court finds that Vogel may be compensated for a total of 12.675 hours. This time, however, accumulated over several years, during which time Vogel billed at various hourly rates: 1.5 hours of Vogel's time is calculable at $235 per hour; 1.875 hours at $255 per hour; 8.1 hours at $275 per hour; and 1.2 hours at $290 per hour. All told, the amount which Bonnie & Co. is liable for Vogel's time in this matter is $3,406.13.

Mandelsberg may be compensated by Bonnie & Co. for a total of one hour in this case. Half of that time was billable at $275 per hour, and half at $295 per hour. As a result, Bonnie & Co. is liable for $285 for Mandelsberg's time.

Kam spent 1.5 compensable hours on this case at $80 per hour. Bonnie & Co. is thus liable for $120 for Kam's time. Novick spent just half an hour of compensable time on this case at $375 per hour. Bonnie & Co. is therefore responsible for $187.50 for Novick's time.

In light of the foregoing calculations, BTC may retain $3,998.63 of Boerer's collateral as compensation for the collection efforts of Hahn & Hessen. In addition, this Court will employ the same method as above to calculating the compensable portion of Hahn & Hessen's disbursements in this case. Hahn & Hessen's $3,998.63 of compensable time constitutes 3.64% of the $110,019.25 of total time they claim to have spent on this case. Accordingly, they may be compensated for 3.64% of the 7,180.99 in total disbursements expended during the course of this litigation, or $261.39. As a result of the foregoing, the total amount which BTC may withhold from Boerer's collateral to fulfill Bonnie & Co.'s liability for Hahn & Hessen's expenses of collection is $4,260.02. Together, this Court finds that the amount which BTC may withhold from Boerer's collateral as payment for the expenses of collection incurred by Moses & Singer and Hahn & Hessen is $20,723.87.

## II. THE WRIT OF EXECUTION

■ As noted above, the Marshals Service transmitted to BTC a Writ of Execution "levying on all right, title interest which Bonnie & Co. Fashion Inc., d/b/a Bonnie & Company . . . has in any funds, property or assets you may be holding in your possession in the amount of $194,092.60." (Marshals Letter.) This amount is comprised of a $194,048.88 judgment entered against Bonnie & Co. in a separate litigation and $43.72 in Marshals fees. *Id.* This Court must now consider whether this Writ of Execution hinders the return of Boerer's $1,000,000 collateral.

This Court finds that it does not. The Writ of Execution states that "[i]n an action between eMTe Corp., plaintiff and Bonnie & Co. Fashion Inc d/b/a Bonnie & Company, d/b/a Bonnie Boerer Unlimited, a New York Corp. defendant," a judgment of $194,048.88 was entered "[i]n favor of said eMTe Corp." (Execution Against Property, *eMTe Corp. v. Bonnie & Co. Fashion, Inc.*, 18–MS–0302 ("Writ of Execution") (May 22, 1997).) This Writ, however, does not name Boerer as an individual defendant in that action. The $1,000,000 collateral presently held by BTC in an account at the United Counties Trust Company in Linden, New Jersey is Boerer's own money which she personally pledged as security for Bonnie & Co.'s factor account with BTC. *See Bonnie & Co.*, 955 F.Supp. at 210. Because eMTe's lawsuit did not name Boerer as an individual defendant, eMTe has no claim to any of Boerer's personal assets, including her $1,000,000 collateral. As a result, this Court finds that the release of Boerer's collateral is not affected by the Writ of Execution.

## III. BTC'S REQUESTS FOR AN ENTRY OF FINAL JUDGMENT UNDER RULE 54(B) AND FOR A STAY PENDING APPEAL

BTC contends that, even after this Court's determines the BTC's expenses of collection, "the balance of [Boerer's] collateral [should] be held in the United Counties Trust account until the conclusion of this action (including

any appeals)." (BTC Memo at 2.) Additionally, BTC asserts that "[i]f th[is] Court concludes that the remaining collateral should be released prior to the conclusion of the entire action, then [BTC] respectfully submits that upon entry of a judgment on Count IV, this Court should: (i) make the express determinations required under [Federal Rule of Civil Procedure ('Rule') ] 54(b) so as to permit [BTC] to appeal therefrom immediately; and (ii) stay such judgment during the pendency of the appeal." *Id.*

As should be expected, plaintiffs vehemently oppose BTC's position. Plaintiffs contend that BTC "fail[ed] to make any of the requisite showings for such relief," and that there are "simply no grounds for a stay here." (Pltf. Reply Memo at 12.) In addition, plaintiffs point out that because this Court's previous rulings in this litigation are "soundly based on recent New York Court of Appeals and Second Circuit precedent, there is almost no chance for reversal," and that even in the event of a reversal, "BTC is adequately protected because Boerer owns a $2 million house that is unencumbered by a mortgage." *Id.*

 Rule 54(b) in relevant part provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Fed.R.Civ.P. 54(b). Rule 54(b) recognizes that "[t]he classic paradigm of a lawsuit—one plaintiff suing one defendant over a single legal wrong—in something of a rarity in modern federal practice." 10 James W. Moore, Moore's Federal Practice § 54.21[1], at 54-35 (3d ed. 1997). Accordingly, the Rule injects "some flexibility into the doctrine that no appeal is permitted until all of the claims in [an] action have been finally adjudicated." *Id.* § 54.21[2], at 54-37. The entry of a Rule 54(b) determination is within the district court's discretion, and is made only upon an affirmative showing of the hardship or injustice that would result is judgment is not entered. *See Anthuis v. Colt Indus. Operating Corp.,* 971 F.2d 999, 1012 (3d Cir.1992); *Braswell Shipyards, Inc. v. Beazer East, Inc.,* 2 F.3d 1331, 1337 (4th Cir.1993); 10 Moore § 54.23[1][b], at 54–69. As stated by the Supreme Court:

> To meet the *demonstrated need* for flexibility ... the District Court may, by the exercise of its discretion in the interest of sound judicial administration, release for appeal final decisions upon one or more, but less than all, claims in multiple claims actions. The timing of such release is, with good reason, vested by the rule primarily in the discretion of the District Court as the one most likely to be familiar with the and any justifiable reasons for delay.

*Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 435–37, 76 S.Ct. 895, 899–901, 100 L.Ed. 1297 (1956) (emphasis added).

In the case at bar, this Court finds that BTC has come forward with no "demonstrated need" justifying this Court's express certification under Rule 54(b). Indeed, BTC has come forward with no hardship or injustice which it might suffer without a Rule 54(b) determination. This Court finds no obvious need for a Rule 54(b) determination in this matter, and is unwilling to speculate upon the reasons which BTC might be able to proffer had its attorneys bothered to do so. Because BTC has utterly failed to provide this Court with a foundation upon which to base a Rule 54(b) determination, this Court finds that BTC's request for such a determination should be denied. Moreover, because this Court finds that no Rule 54(b) determination should be entered to entitle BTC to immediately appeal the instant Opinion and Order, this Court further finds that BTC's request for a stay during the pendency of BTC's appeal should also be denied.

## CONCLUSION

IT IS HEREBY ORDERED THAT judgment be GRANTED to plaintiffs on Count Four, except with respect to punitive damages.

IT IS FURTHER ORDERED THAT BTC effectuate the release to Boerer of the $1,000,000 collateral currently held by the Union Counties Trust Company in Linden, New Jersey, minus $20,723.87 for BTC's expenses of collection, or $979,276.13.

IT IS FURTHER ORDERED THAT BTC's Rule 54(b) request is DENIED.

IT IS FURTHER ORDERED THAT BTC's request for a stay pending appeal is DENIED.

SO ORDERED.